Argued December 23, 1941; reversed January 27; rehearing
denied March 10, 1942

## STATE *v.* McVEY
(121 P. (2d) 461, 123 P. (2d) 181)

338

Before KELLY, Chief Justice, and BAILEY, BELT, LUSK, RAND, ROSSMAN and BRAND, Associate Justices.

*Francis T. Wade*, Assistant Attorney General (I. H. Van Winkle, Attorney General, on the brief), for appellant.

*Herbert Swift*, of Newberg (Weatherford & Thompson, of Albany, on the brief), for respondent.

BAILEY, J. This suit was instituted by the state land board in the name of the state of Oregon against Sam McVey, doing business under the name of McVey Sand & Gravel Company, for an accounting by the defendant to the state land board with reference to sand, rock, and gravel removed by the defendant from the bed of the Willamette river, a navigable stream, and to enjoin the defendant from further removing such materials. From a decree dismissing the suit the plaintiff has appealed.

In the fall of 1926 the defendant began taking, and until the present time has continued to take sand and gravel from the bed of the Willamette river at a point about two and one-half miles above Newberg. The Willamette river at that place flows in a northeasterly direction, but for the purposes of this decision its course will be spoken of as from south to north. On beginning operations the defendant erected on the east bank of the river in Marion county a sand and gravel bunker, the location of which has not since been materially changed. From a pole or spar back of the bunker he stretched an overhead cable, referred to as a high line, and fastened it to a tree or stump on Ash island. The position of this anchorage on the island has been changed from time to time.

Before beginning to dredge, the defendant obtained from the War department permission to "dredge sand and gravel, the materials to be placed ashore for commercial purposes, in Willamette river" at the place where he conducted operations. Other permits were subsequently granted to the defendant, so that all his

dredging and removal of sand and gravel were carried on with permission of the War department.

Ash island is between 5,000 and 6,000 feet long and approximately 1,500 feet in width at its widest point. It is covered with trees and brush. Along the east side of the island and adjoining it is a sand and gravel bar, about three hundred feet wide, in 1926, at a point opposite the defendant's bunker. The island slopes upward from the gravel bar, forming a well-defined bank. The gravel bar is wholly exposed at low water but is completely covered at ordinary high water.

When the defendant started operations the main channel of the Willamette river was, and for many years prior thereto had been, east of Ash island and close to the Marion county bank, which was almost perpendicular. There it was between sixty and seventy feet wide, according to much of the testimony. The width of the entire river, from water's edge to water's edge at low stage, was from ninety to one hundred twenty feet.

On the Marion county side, the bed of the river below the defendant's bunker was formed of hardpan and the defendant had excavated in it a large hole or pit to catch sand and gravel escaping from the bunker. In making the excavation the defendant removed no sand or gravel from the bed of the river. He did, however, from time to time recover from the hole sand or gravel that fell into it from the bunker or the carrier bucket.

To remove sand and gravel the defendant used a bucket suspended from the high line and sliding down by its own weight from the east side of the river to the gravel bar on the west side. As the high line was slackened, the bucket was lowered to the bar. It was loaded by means of a second cable and was then pulled

back by that cable to the bunker on the Marion county bank. It frequently happened that the bucket, after being filled at the gravel bar, was hauled under water for some distance before the slack line was tightened, and some of its load was deposited upon the bed of the river. The defendant removed this deposit as required by United States engineers.

According to the preponderance of the evidence, all the sand and gravel removed by the defendant were taken from the gravel bar above described. In arriving at this conclusion we have examined and considered, in connection with other evidence, the charts introduced as exhibits by the plaintiff, showing the depths of the Willamette river between Ash island and Marion county at low water. All these maps, except one, were prepared by the United States engineers' office in Portland, Oregon. The one excepted is a chart prepared by the assistant state engineer of Oregon. These exhibits, in our opinion, do not establish that the defendant actually took materials from the bed of the river between low water marks. There is no doubt, however, that his excavations on the gravel bar extended through the gravel to the underlying clay, in many places beneath low water mark.

The plaintiff bases its right to an accounting and to an injunction against the defendant on the provisions of chapter 32, General Laws of Oregon 1920, and its subsequent amendments. The chapter as amended is now codified as §§ 121-601 and 121-603 to 121-606, inclusive, O. C. L. A.

Section 121-601, *supra*, grants authority to the state land board "to lease the beds of navigable portions of navigable streams for the purpose of removing gravel, rock and sand therefrom". Leases are to be made only after notice of competitive bidding and only on the

basis of "price per cubic yard for the material removed".

Under § 121-603, *supra*, it is provided that any one desiring to take gravel, rock, or sand from state properties shall apply to the state land board for a lease, the application therefor to be accompanied by a map "showing the premises and the ownership of the abutting property". Before leasing the premises the board is required to give notice of the application, and the lease is required to be awarded to the highest bidder. The section concludes as follows: "The establishment or placing of a dredging or digging outfit on any waters or stream, the bed of which belongs to the state of Oregon, and the removal of material from the bed thereof for commercial uses, without having applied for and received a lease, hereby is declared to constitute a continuing trespass." This quoted provision was added to § 2 of chapter 32, *supra*, as an amendment, by § 1 of chapter 27, Oregon Laws 1937.

By § 5 of chapter 32, *supra*, now § 121-606, O. C. L. A., it is made unlawful for any person to remove gravel, rock, or sand from the bed of any navigable stream of water or from the bars of any navigable stream, for commercial uses, except with the consent of the state land board. And by § 4 of chapter 32, *supra*, as amended by § 2 of chapter 27, Oregon Laws 1937, and now codified as § 121-605, O. C. L. A., the state land board is "authorized to proceed by action at law or suit in equity to enforce payment for all materials heretofore or hereafter taken from any waters or stream, the bed of which belongs to the state of Oregon, for commercial uses, whether under lease, or otherwise, for which payment has not been made."

The defendant has at no time applied to the state land board for a lease to remove sand and gravel from

the bed of the Willamette river where he has been operating since 1926. He asserts that the statute here in question is inapplicable to his operations because they have been confined to that part of the bed of the Willamette river that is between high and low water marks. It is his contention that the state land board under § 121-601, *supra*, is granted authority to lease the beds of only the "navigable portions of navigable streams", and that inasmuch as the gravel bar where he has been operating is above low water of the Willamette river he has not been removing materials from the bed of any navigable portion of a navigable stream.

■ We do not so construe the meaning of this statute. When the lawmakers spoke of the "navigable portions of navigable streams" they had reference to the longitudinal rather than the lateral limits of navigability of such streams. They were aware of the fact that at the point above which navigability ceases in any stream and such stream becomes nonnavigable the title to the bed of the stream is in the owners of abutting lands, and that within the navigable length of a stream the state is *prima facie* owner of the bed thereof below ordinary high water marks: *Coquille Mill & Mercantile Co. v. Johnson*, 52 Or. 547, 98 P. 132, 132 Am. St. Rep. 716; *Micelli v. Andrus*, 61 Or. 78, 120 P. 737, and cases therein cited.

■ The purpose of enacting chapter 32, *supra*, was to recover for the irreducible school fund the reasonable value of gravel, rock, and sand removed from property belonging to the state, and to confer upon the state land board jurisdiction to supervise the removal of such materials and obtain payment for them. The state is as much concerned in collecting payment for materials removed from the beds of navigable streams between high and low water marks, when such areas

belong to the state, as for materials removed beneath low water mark. Construing as a whole the statute under consideration, we conclude that the legislature did not intend to limit its application to the beds of navigable streams between low water marks.

As affirmative answer the defendant alleges that he "has acquired gravel from owners other than the plaintiff and has removed gravel from land owned by persons other than the plaintiff under arrangements and agreements made with such owners for such lands." In an attempt to prove this allegation of his answer the defendant testified that since 1930 one Ross Woods had been the owner of Ash island. He then stated that he had an agreement with Mr. Woods in regard to taking gravel from the bar. This last testimony was objected to by counsel for the plaintiff, and the trial court stated that it did not matter whether the defendant had any such agreement, if it appeared that the material was taken from premises not belonging to the state. In arriving at its decree the trial court apparently assumed that inasmuch as the gravel bar lay between high and low water marks the gravel that was taken belonged to the riparian owner. This presumption indulged in by the court does not follow from the facts shown by the record.

■ When the state of Oregon was admitted to the Union it became the owner of the beds below high water marks of all navigable streams within its boundaries: *Oregon v. Oregon General Electric Co.*, 52 Or. 502, 519, 95 P. 722, 98 P. 160; *Shively v. Bowlby*, 152 U. S. 1, 38 L. Ed. 331, 14 S. Ct. 548. Such ownership in the state of Oregon is presumed to continue until the state is shown to have parted with its title: § 2-407, subdivision 33, O. C. L. A.; *Templeton v. Bockler*, 73 Or. 494, 144 P. 405.

The defendant attempts to overcome this presumption by claiming that the state of Oregon has granted and confirmed to riparian owners of lands along the Willamette river title to the adjoining bed of that stream between high and low water marks. In this connection he directs attention to an act passed in 1872 (General Laws 1872, page 129), as amended by General Laws 1874, page 76, and General Laws 1876, pages 69 and 70, and the decisions of this court construing those laws. One of the most recent of such decisions is *State v. Imlah*, 135 Or. 66, 294 P. 1046, wherein this court said:

"But that question [the location of meander lines of the Willamette river] is not important because, subsequent to the time when the lands now owned by defendants were patented, by an act of the legislative assembly (Laws, 1872, p. 129, as amended by Laws, 1874, p. 76, and Laws, 1876, p. 69), the state of Oregon granted and confirmed to the owners of upland abutting on the Willamette river all the lands opposite such holdings between high and low water marks: Pacific Elevator Co. v. Portland, 65 Or. 349 (133 P. 72, 46 L. R. A. (N. S.) 363); Richards v. Page Inv. Co., 112 Or. 507 (228 P. 937); Lange v. St. Johns Lumber Co., 115 Or. 337 (237 P. 696); Gatt v. Hurlburt, 131 Or. 554 (284 P. 172)."

If title to Ash island had passed into private ownership prior to repeal by the act of 1878 (General Laws 1878, pages 54 and 55) of the statutes on which the defendant relies, then the state of Oregon by force of the statutes of 1872, 1874 and 1876, *supra*, was divested of ownership of the river bed between high and low water marks, contiguous to Ash island. In that case there would be no basis for the presumption that the state is now the owner of the gravel bar from which the defendant has been removing materials.

There is nothing in the record, however, to indicate when Ash island passed into private ownership. Title to the island might have been acquired by the predecessors in interest of its present owners either from the federal government or from the state of Oregon subsequent to the repeal of the statutes upon which the defendant relies. If so, the state of Oregon would at present be the owner of the bed of the Willamette river to high water mark on the island, for the reason that since 1878 there has been no statutory provision by which the state could part with title to it.

The defendant argues that if title to Ash island had not passed from the federal government prior to the effective date of the 1878 repealing act, then the patentee from the federal government would have acquired title to the bed of the Willamette river between high and low water marks, adjoining Ash island. There is no merit in this contention, for the reason that the acts of 1872, 1874 and 1876, *supra*, did not grant and confirm to the federal government title to any parts of the beds of navigable streams.

Prior to the passage of those acts the riparian owners along the Willamette river had assumed that they had certain rights to the use of the bed of the stream between high and low water marks, and in order that such rights should not be disturbed the acts in question were passed: *Lewis v. City of Portland,* 25 Or. 133, 35 P. 256, 22 L. R. A. 736, 42 Am. St. Rep. 772. It is recognized, impliedly at least, in *State v. Imlah,* supra, that the grant by the state was not to the federal government, for therein it is stated that "subsequent to the time when the lands now owned by defendants were patented," the 1872 law and the amendments thereto were enacted by the legislature and thereby the defendants became the owners of the

river bed there involved. Moreover, there was no possible purpose to be accomplished by granting to the federal government title to the bed of the river between high and low water marks. "Legislative enactments presumptively affect only private rights and do not embrace the rights of a sovereign unless the sovereign is explicitly designated or clearly intended": *Commonwealth v. Dauphin County,* 335 Pa. 177, 6 A. (2d) 870. See also: *Fidelity & Deposit Company of Maryland v. State Bank of Portland,* 117 Or. 1, 242 P. 823; *State v. City of Des Moines,* 221 Iowa 642, 266 N. W. 41; *State Highway Department et al. v. Mitchell's Heirs,* 142 Tenn. 58, 216 S. W. 336; *California Iron Yards Co. v. Commissioner of Internal Revenue,* 47 F. (2d) 514; and 59 C. J., Statutes, § 653.

■■ On the record before us the plaintiff has made out a *prima facie* case that the state of Oregon is the owner of the bar from which the defendant has for many years been removing sand and gravel. This necessitates a reversal of the decree of the circuit court. Inasmuch as the suit was dismissed, there was no finding by the court of the amount of the sand and gravel removed by the defendant. The only evidence in the record as to the value of those materials is the testimony of Lewis Griffith, clerk of the state land board, as follows:

"Q. In connection with this case, will you please state what is the latest establishment by the rules and regulations of the state land board as to what they call royalty on sand and gravel?

"A. Ten cents a cubic yard."

This does not amount to proof of the reasonable value of the sand and gravel taken by the defendant.

Although this court might, on the record here presented, grant partial relief to the plaintiff by reversing

the decree appealed from and remanding the cause with instruction to the trial court to enjoin the defendant from further removing materials from the bed of the Willamette river, nevertheless we are of the opinion that the cause should be remanded for further proceedings.

■ On further hearing in the circuit court the defendant should be given opportunity to offer proof as to when title to Ash island passed into private ownership. His answer is sufficiently comprehensive to permit the introduction of such evidence. It appears to have been assumed by the defendant and by the trial court that riparian owners of lands abutting navigable portions of the Willamette river own the adjoining bed of the river between high and low water marks, and that the only question involved in this case was whether the gravel bar from which the defendant removed sand and gravel is above low water mark. In the event that the defendant fails to prove that title to Ash island was in private ownership prior to the effective date of the 1878 act, *supra,* he should be required to account to the plaintiff for all the sand and gravel that he has taken from the bed of the Willamette river since he began operations in 1926.

■ The defendant in his brief discusses laches on the part of the plaintiff in not sooner instituting this suit. That defense was not pleaded by him in his answer, nor did he raise the question at all in the trial court. Under those circumstances, we will not consider it: *Tanous v. Johnston,* 113 Or. 343, 232 P. 793. We express no opinion as to whether the defense of laches would be available against the state of Oregon as the real party in interest.

If the defendant fails to prove that the gravel and sand were removed from property not belonging to the

state, and is required to account therefor, permission should be given the plaintiff to introduce such other and additional evidence as it may desire. The plaintiff should also be given opportunity to prove, regardless of the ownership of the gravel bar, whether the defendant has removed sand and gravel from the bed of the river below low-water mark, and, if such be the fact, to have an accounting for the reasonable value of the sand and gravel so removed.

The decree appealed from is reversed and the cause is remanded to the circuit court for further proceedings not inconsistent with this opinion. Costs and disbursements in this court will abide the final determination of this cause in the circuit court.

---

Petition for rehearing denied March 10, 1942

ON PETITION FOR REHEARING
(123 P. (2d) 181)

BAILEY, J. In a petition for rehearing, the defendant, respondent here, asserts that in our former opinion we misconstrued the statute of 1872 (General Laws 1872, page 129) as amended by General Laws 1874, page 76, and further amended by General Laws 1876, page 69, in holding that the grant by the state of Oregon of the bed of navigable portions of Willamette river between high and low water marks to the owners of riparian lands along such parts of the Willamette river did not apply to the United States as owner of lands abutting that river.

The 1872 enactment referred only to the sale of tide lands belonging to the state, but since we are concerned with the subsequent amendments of that act and with the interpretation to be given the word "owners"

as therein used, we shall now direct attention to the preamble of the 1872 act, reading as follows:

"Whereas, in many of the bays, harbors and inlets on the sea coast of this state the sea is annually encroaching upon the land—washing away the shores and shoaling such bays, harbors and inlets; and

"Whereas, such encroachments can be prevented only at great expense and by occupying and placing improvements upon the tide and overflowed lands belonging to the state; and

"Whereas, it is desirable that facilities and encouragement should be offered to the owners of the soil abutting upon the coast in such bays, harbors and inlets, to make improvements and expenditures that will stay such encroachments; . . ."

This is succeeded, after the enacting clause, by § 1, which was amended in 1874 so as to include the grant of lands between high and low water marks along the navigable portions of Willamette river. This section as amended in 1874 thus reads:

"That the owner or owners of any land abutting or fronting upon or bounded by the shore of the Pacific ocean, or of any bay, harbor or inlet of the same, and rivers and their bays, in which the tide ebbs and flows, within this state, shall have the right to purchase all the tide land belonging to this state in front of the lands so owned; provided, that, if valuable improvements have been made upon any of the tide lands of this state before the title to the land on the shore shall have passed from the United States, the owner of such improvements shall have the exclusive right to purchase the lands so improved, extending to low water marks, for a period of three years from the approval of the act to which this is amendatory; provided further, that the Willamette river shall not be deemed a river in which the tide ebbs and flows within the meaning of this act, or of the act to which this act is amendatory; and the title of this state to any tide or overflowed lands upon said Willamette river is

hereby granted and confirmed to the owners of the adjacent lands, or when any such tide or overflowed lands have been sold, then in that case, to the purchaser or purchasers of such tide or overflowed lands from such owner of such adjacent lands, or some previous owner thereof, as the case may be.''

The language beginning with the words ''provided further'' is the new matter added by the 1874 amendment. There was also some change made in the first part of § 1, which is not here material. This section was further amended in 1876 to include with the Willamette these rivers: Coos, Coquille and Umpqua.

Section 5 of the 1872 act was also amended in 1874, and in both original and amended forms refers merely to the sale of tide lands. As amended it provides generally that if ''any person or persons who, at the passage of the act of which this act is amendatory, were entitled to purchase any tide lands under the provisions of section 1 thereof,'' shall not have applied to purchase the same within three years after the passage of the original act, then ''any other person who is a citizen and resident of the state of Oregon'' may make application to purchase such tide lands. This section as amended in 1874 concludes as follows:

''. . . Provided further, that if the United States has parted or shall part with its title to any lands of which, at the passage of the act of which this is amendatory, it was the owner, the grantee of such lands shall have three years after perfecting his title from the United States to apply for all tide lands in front thereof, which may be owned by the state, and in case of his failure to make such application within said period of three years, or having made such application shall fail to prosecute the same according to law, such tide land shall be open to purchase by any other person who is a citizen and resident of the state of Oregon.''

■ In construing the statutes involved herein we must ascertain, if possible, what was the intention of the legislature in enacting them: § 2-217, O. C. L. A. It is also proper to take into consideration the historical background of the legislation: *Superior Oil Syndicate v. Handley*, 99 Or. 146, 195 P. 159. With reference to the statutes hereinabove mentioned, this court, in *Bowlby v. Shively*, 22 Or. 410, 416, 30 P. 154, said:

"These statutes are based on the idea that the state is the owner of the tide lands and has the right to dispose of them; that there are no rights of upland ownership to interfere with this power to dispose of them and convey private interests therein, except such as the state saw fit to give the adjacent owners, and to acknowledge in them and their grantees when they had dealt with such tide lands as private property, subject, of course, to the paramount right of navigation secured to the public."

Elsewhere in the same opinion the court also observed, "but, in consideration of the fact that prior to 1872, as it would seem, these lands had been dealt with as private property, and sometimes improved by expensive structures, the acts further provide in such cases, that where the bank owners had actually sold the tide lands, then the purchaser of the tide lands from the bank owner, or a previous bank owner, should have the right to purchase from the state." It was undoubtedly due to the fact that many riparian owners along the Willamette, Coos, Coquille and Umpqua rivers had treated the river beds between high and low water marks as private property and had sometimes improved such parts of the river beds by the erection of expensive structures, that the legislature amended the 1872 enactment so as to protect them and their investments by making a grant of the beds of

those rivers above low water mark to the riparian owners: *Lewis v. City of Portland*, 25 Or. 133, 35 P. 256, 22 L. R. A. 736, 42 Am. St. Rep. 772.

The legislature was concerned with private ownership of property abutting upon tide lands and property adjacent to the beds of certain designated navigable rivers. It was not concerned with the United States as owner of any such lands. In that part of the enactments referring to the purchase of tide lands, it is obvious that the legislature did not use the word "owner" as including the United States, for in § 1 of the acts, original and amended, it granted to those who had made improvements upon tide lands before title to the shore land passed from the United States a definite period after the date of the enactment in which to make application for purchase of the tide lands; and in § 5 it provided that any grantee of the United States government should have a certain period "after perfecting his title from the United States" in which to apply to purchase the tide land in front of his property acquired from the federal government. It may be noted in this connection that the act did not grant to a settler the right to purchase the tide land until after he had received a patent from the federal government.

We must assume, with nothing to the contrary shown, that the legislature in granting and confirming to riparian owners title to parts of the beds of navigable rivers used the words "owner" and "owners" in the same sense that they were employed in the same act with reference to the purchase of tide lands. The wording of the preamble to the original act, and of the act and its amendments, clearly indicates that the legislature did not have in mind the United States as a purchaser of tide lands. Furthermore, in the provision

relating to owners of property adjacent to the beds of certain rivers the amended act provides that the title of the state "is hereby granted and confirmed to the owners of adjacent lands", and such owners must accordingly be understood to be those asserting claims to parts of the river beds. The United States government was not, at the time of the passage of these acts, claiming any title to the beds of the navigable streams herein mentioned.

■ The state of Oregon upon its admission to the Union became the owner of the tide lands and beds of navigable waters within its boundaries, not as grantee of the United States but by virtue of its own sovereignty. The tide lands and the soil beneath navigable waters were not "granted by the Constitution to the United States, but reserved to the states respectively": *Pollard's Lessee v. Hagan,* 44 U. S. (3 How.) 212, 229, 11 L. Ed. 565; *Bowlby v. Shively,* supra.

In *Pollard's Lessee v. Hagan,* supra, it was contended that by reason of declarations contained in the compact entered into between the United States and the state of Alabama when the latter was admitted into the Union, Alabama had transferred or relinquished to the federal government all rights to the beds of navigable waters within that state. The court denied that the compact had any such effect, stating:

". . . In the case of Martin and others v. Waddell, 16 Pet., 410, the present chief justice, in delivering the opinion of the court, said: 'When the Revolution took place, the people of each state became themselves sovereign; and in that character hold the absolute right to all their navigable waters, and the soils under them for their own common use, subject only to the rights since surrendered by the Constitution.' Then to Alabama belong the navigable waters, and soils under them, in controversy in this case, sub-

ject to the rights surrendered by the Constitution to the United States; and no compact that might be made between her and the United States could diminish or enlarge these rights.

  *    *    *    *    *

". . . To give to the United States the right to transfer to a citizen the title to the shores and the soils under the navigable waters, would be placing in their hands a weapon which might be wielded greatly to the injury of state sovereignty, and deprive the states of the power to exercise a numerous and important class of police powers. But in the hands of the states this power can never be used so as to affect the exercise of any national right of eminent domain or jurisdiction with which the United States have been invested by the Constitution."

■ The grant of the bed of the river between high and low water marks to owners of adjacent property applies not only to the Willamette river but to three other navigable rivers in Oregon. To construe the statutes of 1872, 1874, and 1876 as including the United States among such owners, as contended for by the defendant, would be contrary to the intention of the legislature and might entail the possible consequences noted in the excerpt last above quoted. We adhere to our former opinion that the statutes here involved did not grant or confirm title in the United States government to any parts of the beds of navigable waters in this state. The word "owners" as used in the statutes referred to the grantees of the United States government and their successors in interest.

■ In our former opinion we refused to consider the question of laches, as not timely presented. The respondent urges in his petition for rehearing that we give this matter further attention. Aside from the question of whether the defense of laches is available

against the state in a case of this nature, upon which we express no opinion, our view is that there is nothing in the record that would estop the plaintiff from maintaining this suit.

The defendant began operations in the autumn of 1926. The original complaint was filed May 5, 1938, and the second amended complaint was filed on August 19 of the same year. The clerk of the state land board had made an effort to obtain an audit of the defendant's books, which the defendant would not permit. It is not shown that the plaintiff in any way led the defendant to believe that it acquiesced in his operations, nor does it appear that the defendant made any improvements or expenditures in reliance upon the failure of the plaintiff sooner to institute this suit. The plaintiff would not be barred by the statute of limitations, § 1-211, O. C. L. A., from maintaining an action at law to collect the reasonable value of sand and gravel removed by the defendant. In view of the facts in the case, we believe that the defendant has not in any way been prejudiced by the plaintiff's delay in litigating its claim.

Further, we find no merit in the defendant's assertion that the conduct of plaintiff's counsel in the circuit court prevented the defendant from introducing evidence as to the time when title to Ash island passed from the United States into private ownership.

The petition for rehearing is denied.

RAND, J., dissents.