Argued March 7, 1967, reversed April 10, petition for
rehearing denied June 18, 1968

# CORVALLIS SAND & GRAVEL CO., *Respondent, v.* STATE LAND BOARD, *Appellant.*

439 P. 2d 575

See

*Peter S. Herman,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the briefs was Robert Y. Thornton, Attorney General.

*Thomas H. Tongue,* Portland, argued the cause for respondent. With him on the briefs were Robert Mix, Corvallis, and Hicks, Tongue, Dale & Strader, Portland.

Before PERRY, Chief Justice, and MCALLISTER, SLOAN, O'CONNELL, GOODWIN, DENECKE and LUSK, Justices.

LUSK, J.

This is a suit in equity brought by Corvallis Sand & Gravel Co., a corporation, to enjoin the State of Oregon, acting by and through the State Land Board, from prosecuting an action of ejectment commenced by the state against the corporation. The state demurred to the complaint on the ground that its allegations "do not constitute an equitable defense to the allegations of the ejectment action brought by the

State of Oregon"; the trial court overruled the demurrer and, the state refusing to plead further, a decree was entered in favor of the plaintiff. The state appeals.

The complaint in the ejectment action alleges that the state, by virtue of its sovereignty, is now, and at all times since the state's admission into the Union, has been the owner of the bed of the Willamette River lying within Benton and Linn Counties in a location particularly described; that the defendant Corvallis Sand & Gravel Co. now wrongfully withholds, and for six years immediately prior to the filing of the complaint, has wrongfully and continuously withheld, possession of such real property from the state and that the reasonable value of the annual use of said real property was $50,000. Judgment was asked for the immediate possession of such property and damages in the sum of $300,000.

The plaintiff, (hereinafter referred to as the corporation) in the suit before us, instead of filing a pleading in the ejectment action, filed a complaint in equity, the allegations of which may be summarized as follows: The corporation denies that the state owns the real property in question or has been damaged as alleged in the ejectment action; it alleges that as a result of an avulsive change in the channel of the Willamette River, in November of 1909, a new channel was formed, which flowed over land held in private ownership and said avulsive channel underwent further changes as the result of extensive excavations made therein from 1913 to 1918; that about 1920 the predecessor of the corporation commenced operation of a sand and gravel business on the avulsive channel and the corporation claims ownership "of the present bed

of the Willamette River below high water marks" in the location in controversy; that such sand and gravel business has been conducted by the corporation and its predecessors continuously, openly and notoriously since the year 1920; such business at the present time grosses $1,000,000 per year, has a capital value in excess of $500,000, employs as many as 100 persons, has an annual payroll in excess of $400,000, and supplies 50 per cent of the sand and gravel used in construction in the vicinity of Corvallis and obtains most of its materials from said channel. There follow allegations intended to show laches on the part of the state in bringing the ejectment action, to wit: The state has been aware of the operation of the corporation and its predecessor since prior to 1933 and of the corporation's claim of private ownership of such channel; prior to filing the ejectment action the state, through the State Land Board, filed two suits to establish its claim of ownership to the channel, the first, in 1958, resulting in an involuntary nonsuit "because the plaintiff had failed to prove its case," and the second, in 1960, resulting in voluntary dismissal by the state. Furthermore facts are alleged to show prejudice to the corporation resulting from the long delay of the state in asserting its rights—the expense of litigation, the payment of taxes by the corporation on the real property in dispute, and the difficulty of establishing, so long after the event, the facts surrounding the formation of the avulsive channel. The prayer is for a decree perpetually enjoining the state from prosecuting the ejectment action or prosecuting any legal action in the premises or making any claim whatsoever to the portion of the bed of the Willamette River in question.

A procedural question will be decided before going to the merits. Since the amendment adopted in 1917,

now ORS 16.460, authorizing the defendant in a law action to set up an equitable defense in his answer, cross-bills, such as the corporation's complaint, have not been permissible. Prior to the amendment the statute abolished cross-bills, "except as hereinafter mentioned," and provided that "where the defendant is entitled to relief, arising out of facts requiring the interposition of a court of equity, and material to his defense, he may, upon filing his answer therein, also as plaintiff, file a complaint in equity, in the nature of a cross-bill, which shall stay the proceedings at law," etc., L O L § 390. Under ORS 16.460 cross-bills are abolished without any exception, and the provision for filing by the defendant of a complaint in equity in the nature of a cross-bill is eliminated and in its place is substituted the now familiar and frequently invoked provision authorizing the filing of what has become known as an equitable answer.

■ The question was passed upon in *Hopka v. Forbes,* 135 Or 91, 294 P 342, where the court said, at page 93:

"The filing of a cross-bill by a defendant in a law action, interposing an equitable defense to the action, is no longer permissible under our code. By chapter 95, Laws of 1917, cross-bills were especially abolished and the procedure existing prior thereto was very much simplified by the amended statute."

See, also, *Hughes v. Flier et ux.,* 203 Or 612, 617, 280 P2d 992.

A ruling to the contrary in *Churchill v. Meade,* 92 Or 626, 182 P 368, was not cited in *Hopka v. Forbes,* but that decision overruled *Churchill v. Meade sub silentio,* and properly so, because the opinion in the latter case fails to give effect to the changes in the

statute to which we have called attention and, in particular, to the provision abolishing cross-bills.

■ Treating the complaint, however, as though the affirmative defense of laches was set forth in an equitable answer filed pursuant to the statute, we are of the opinion that such defense is not available to the corporation. Ejectment is an action at law and laches is available only against a party seeking the aid of equity. It is an application of the doctrine that equity aids only the vigilant or, as stated by Pomeroy, "in some of its applications it may properly be regarded as a special form of the yet more general principle, He who seeks equity must do equity." 2 Pomeroy's Equity Jurisprudence (5th ed) 169-170, § 418. "Laches is a doctrine peculiarly applicable to suits in equity": Idem, 172, § 419, Note 7, citing numerous cases. This court has never applied the doctrine of laches as a defense to an action at law. The case of *State ex rel. Security Savings & Trust Co. v. School District No. 9,* 148 Or 273, 287, 31 P2d 751, 36 P2d 179, is only a seeming exception to the rule. This was a proceeding in quo warranto, denominated an "action at law" in the statute, ORS 30.510. The defendants pleaded laches of the relators and the latter urged that this defense was available only in suits in equity. This court held the defense available because the proceeding before it was equitable in nature. After a brief review of the history of quo warranto, the court said:

> "* * * Issuing from a court of chancery and commanding a return of a nature foreign to the writs of the courts of law, it follows that by the common law quo warranto was an authorized process for the assertion of a remedy in its nature equitable, namely, the disclosure by defendant of the claim under which he exercises the franchise in question.

"The statute of Oregon gives a remedy in lieu of the common law writ of quo warranto and calls that remedy an action at law. It is in truth merely a statutory proceeding for the exercise of the equitable right to compel disclosure as above mentioned, as well as to determine whether the franchise in question is being legally exercised." 148 Or at 285-286.

■ By this decision the court gave recognition to the rule that laches may not be used as a defense against a claim purely legal. It is the prevailing rule in this country. In addition to the authorities above cited, see *Wehrman v. Conklin,* 155 US 314, 326-327, 15 S Ct 129, 39 L ed 167; *Horner v. Jobs,* 13 NJ Eq 19; *Clark v. Clapp,* 14 RI 248; *Thorpe v. Wm. Filene's Sons Co.,* 40 F2d 269 (DC Mass); *Kitchens v. Wheeler,* 200 Ark 671, 681, 141 SW2d 34; *Fox v. Lofton,* 185 Ga 456, 195 SE 573; *Lowry v. Lyle,* 226 Mich 676, 684, 198 NW 245; McClintock on Equity (2d ed) 75-76; 1 Wood on Limitations (4th ed) 287; 28 CJS 898, Ejectment § 49.

■ In a few states where law and equity are merged the doctrine under consideration does not apply. But, as we held in *Gellert v. Bank of California Nat. Assn.,* 107 Or 162, 185, 214 P 377, ORS 16.460 "does not abolish the distinction between actions at law and suits in equity, although it avoids some of the inconveniences formerly suffered and does away with a few of the merely formal steps which were previously required." And it need hardly be said that the corporation did not, by filing a suit seeking to enjoin the state's action at law on the ground of laches, succeed in converting that action into a suit in equity.

But even on the assumption that the plea of laches would be otherwise available to the corporation the negligence of public officers in bringing the ejectment

action cannot, for the reasons now to be stated, preclude the state from obtaining the relief to which it claims to be entitled in a case of this character.

We will now review our decisions touching this question. In two suits brought by the state to cancel deeds to swampland issued by it, the defense of laches was sustained: *State v. Warner Valley Stock Co.*, 56 Or 283, 106 P 780, 108 P 861; *State of Oregon v. Hyde*, 88 Or 1, 169 P 757, 171 P 582, Ann Cas 1918E 688, of which more later. There were similar holdings in quo warranto actions: *State ex rel. Security Savings & Trust Co. v. School District No. 9*, supra; *State ex rel. Hallgarth v. School District No. 23*, 179 Or 441, 172 P2d 655; *State ex rel. Teegarden v. Union High School*, 152 Or 412, 53 P2d 1047; *State ex rel. Weatherford v. Hayworth*, 152 Or 416, 53 P2d 1048. In these cases the writs were sued out by private relators and it should be noted that in *State ex rel. Security Savings & Trust Co. v. School District No. 9* the court called attention (148 Or at 286) to the following statement from *O'Leary v. Reiner*, 9 NJ Misc 950, 156 A 120:

> "Although it may be conceded that lapse of time will not bar the state through its attorney-general from successfully prosecuting a *quo warranto* proceeding where the rights of the state are involved, this doctrine has no application where the writ is sued out by a private relator. In such a case, unreasonable delay on the part of the relator may properly preclude him from maintaining the proceeding."

Similarly in *State ex rel. Hallgarth v. School District No. 23* we said that *State ex rel. Teegarden v. Union High School* and *State ex rel. Weatherford v. Hayworth* "are two recent instances in which this court held that laches bars the state, *when it is acting upon*

*the relation of a private party,* from challenging the validity of a school district." (Italics added.) 179 Or at 461.

Further, this court held in *City of Pendleton v. Holman,* 177 Or 532, 164 P2d 434, 162 ALR 249, that the defense of laches was available in a suit by a municipality to foreclose a lien for a street improvement assessment. The ground of the decision was that the city, in attempting to collect the assessment, was acting in its proprietary capacity. 177 Or at 551.[①]

On the other hand, we have held that laches was not a bar to a suit by the state to escheat property of a deceased person: *State v. Vincent,* 152 Or 205, 52 P2d 203. We said:

> "As stated, appealing defendants interpose the objection that plaintiff has been guilty of laches. By the weight of authority, the defense of laches is not available against the government, state or national, in a suit by it to enforce a public right or to protect a public interest: 21 C. J., Subject: Equity, page 217, section 216, and authorities cited in note 94. It cannot be gainsaid that by this suit

---

[①] Blue v. City of Union, 159 Or 5, 75 P2d 977, does not hold, as suggested in the corporation's brief, that an undertaking by a city is proprietary when it is an activity "from which it derives a revenue." We said in that case:

"* * * Now, no matter how great nor how numerous may be the difficulties in distinguishing between these capacities, it is established law that when a corporation exercises a purely corporate and proprietary or private function, such for example, as the maintenance and operation of a municipal wharf or airport or public utility, or water system, from which it derives a revenue, it is subject to suit without statutory authority, the same as any individual similarly engaged * * *." 159 Or at 11-12.

It was not the mere fact that the municipality derived a revenue from the activity, but the particular type of activity which was determinative of the question whether a municipality was engaged in a governmental or proprietary undertaking.

the state seeks to enforce a public right and protect a public interest."· 152 Or at 214.

The same doctrine was enunciated in *In re Estate of Moore,* 190 Or 63, 75, 223 P2d 393, where the validity of a devise of lands to the United States Government was in question and it was contended that the government was late in asserting its claim.

We have also held that laches may not be employed as a defense in a disbarment proceeding brought by the Oregon State Bar, which is "an instrumentality of the Judicial Department of the government of the State of Oregon": ORS 9.010; *In re J. Kelly Farris,* 229 Or 209, 367 P2d 387.

Laches is akin to estoppel. In *Rohde v. State Industrial Acc. Com.,* 108 Or 426, 217 P 627, a claimant for compensation from the Industrial Accident Fund contended that the commission was estopped to urge the insufficiency of his application for compensation. We held that the fund in the hands of the commission is trust money; that the Workmen's Compensation Law was enacted under the police power, a governmental, not a proprietary function; and that "in all governmental affairs as distinguished from mere proprietary matters, neither the state nor any of its officers acting in a governmental capacity is estopped by any act of any such officer," 108 Or at 438. The court went on to quote with approval the following from *People v. Brown,* 67 Ill 435:

"Public policy, to prevent loss to the state through the negligence of public officers, forbids the application of the doctrine of estoppel to the state, growing out of the conduct and representations of its officers. On the same ground that the **government is excused from the consequence of**

laches, it should not be affected by the negligence or even willfulness of any one of its officers. (Citations omitted.)" 108 Or at 438-439.

In *Johnson v. Tax Commission,* 248 Or 460, 435 P2d 302, we applied what was acknowledged to be an exception to the general rule, and held in a case involving the collection of taxes—obviously a governmental function—that the government was estopped when it misinformed a taxpayer to his loss regarding the time within which he was required to establish exemption from ad valorem tax on his automobile. This doctrine was said to be rarely applied and only when to refuse to apply it would be "inequitable to a high degree."

Finally, the very question before us, viz., whether laches can be invoked against the state when it is asserting its title to the bed of the Willamette River, was left open in *State v. McVey,* 168 Or 337, 121 P2d 461, 123 P2d 181. This was a suit by the state for an accounting of the proceeds of sand, rock and gravel removed by the defendant from the bed of the river and to enjoin defendant from further removing such materials. The court held that the issue of laches was not in the case because it was not pleaded and not raised in the court below, and added that it expressed no opinion whether laches was available against the state "in a case of this nature." 168 Or at 356-357.

■ Counsel for the corporation rely on the *Warner Valley* case, but we think their reliance is misplaced. The deeds there sought to be cancelled were given, the first in 1883, the last in 1899. The suit was commenced in 1907. Until 1903 the statutes of limitation were expressly made applicable to the state, Deady's Code § 13. In that year the statute was amended by providing that limitations should not apply to the state

or other public corporations, Oregon Laws 1903, page 18. Such has been the law ever since. ORS 12.250. The only cause of suit in the *Warner Valley* case held to be barred by laches involved the deed issued in 1883. Statutes of limitation, of course, do not govern in suits in equity, but may be applied by analogy, and that is what the court did. The case was before the court on demurrer to the complaint and the court held: "More than the statutory period of limitation had elapsed since its [the 1883 deed's] execution when this suit was commenced, and thus it appears *prima facie* that plaintiff is guilty of laches, such as will bar the suit, unless excuse for the delay is shown." 56 Or at 304. It was then held that the allegations of the complaint failed to state an adequate excuse and, therefore, the suit was barred as to the 1883 deed. That is all that the court held on this question. See analysis of the *Warner Valley* case in *City of Pendleton v. Holman,* supra, 177 Or at 542-546. As we there said with reference to the 1883 deed: "[T]he court did give effect to the statute of limitations."

When, therefore, the court in 1918, 15 years after the statutes of limitation ceased to be applicable to the state, cited the *Warner Valley* case in *State of Oregon v. Hyde,* supra, to the following statement: "We are committed to the principle that the doctrine of laches is applicable to the state": 88 Or at 40, it rested upon an insecure foundation. To buttress the proposition the court cited two other authorities. One was *United States v. White,* 17 Fed 561, 565 (CC D Cal, 1883), a suit by the United States to cancel a patent to government lands on the ground of fraud. The holding in that case, that the United States government was subject to the defense of laches, is contrary to a long line of cases decided by the Supreme Court of the United

States, some of which will be hereinafter referred to. The other authority was *Commonwealth v. Philadelphia, B. & B. M. Turnpike Co.,* 153 Pa St 47, 25 A 1105. As appears from the cases cited in the footnotes in 30A CJS 34, Equity § 114, the Pennsylvania decisions are in a decided minority upon this question. The Pennsylvania court holds that the state may be barred by laches even when it acts in a governmental capacity. For example, in a recent decision, *Stahl v. First Pa. Bank. & Trust Co.,* 411 Pa St 121, 191 A2d 386, an escheat proceeding, it was held that laches was available against the state. This ruling is contrary to our decision in *State v. Vincent,* supra, also an escheat case.

Nor is there anything in *Warner Valley* to justify the conclusion that it stands for the proposition that the State of Oregon in holding and administering its public lands acts in a purely nongovernmental capacity. The basis of the decision has been stated and there is no suggestion in the briefs of counsel or the opinion of the court that this question was even considered. There is, indeed, no reason why it should have been, for the statute of limitation in effect at that time applied to the state in all its activities, governmental or otherwise. *Schneider v. Hutchinson,* 35 Or 253, 257, 57 P 324, 76 Am St Rep 474; *City of St. Paul v. Chicago, M. & St. P. Ry. Co.,* 45 Minn 387, 397, 48 NW 17. Cf. *City of Pendleton v. Holman,* supra, 177 Or at 541. The views expressed in the *Hyde* case (and repeated in *State ex rel Sec. Sav. & Trust Co. v. School District No. 9,* supra, 148 Or at 287) appear on their face to be all-encompassing and, again, the governmental versus nongovernmental question was not discussed or, apparently, considered.

By the great weight of authority in this country

the defense of laches is not available against the government, state or national, in a suit by it to enforce a public right or protect a public interest, *State v. Vincent,* supra; 30A CJS 34, Equity § 114. Such a suit, it is held by the Supreme Court of the United States, is one to establish the government's title to, or right in, public lands. *United States v. California,* 332 US 19, 67 S Ct 1658, 91 L ed 1889, presented the question whether the United States or California owns the submerged lands off the coast of California between the low water mark and the three-mile limit. The state set up the defense, among others, that the government was barred from enforcing its rights by reason of principles similar to laches, estoppel or adverse possession. In rejecting this contention the court said:

"* * * And even assuming that Government agencies have been negligent in failing to recognize or assert the claims of the Government at an earlier date, the great interests of the Government in this ocean area are not to be forfeited as a result. The Government, which holds its interests here as elsewhere in trust for all the people, is not to be deprived of those interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property; and officers who have no authority at all to dispose of Government property cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act." 332 US at 39-40.

The principle that lands of the United States are held in public trust and that the government is therefore not estopped by the negligence of its officers to assert its title to such lands has been stated in numerous other cases by the Supreme Court of the United States: *United States v. San Francisco,* 310 US 16,

32, 60 S Ct 749, 84 L ed 1050; *Utah v. United States,*
284 US 534, 545-546, 52 S Ct 232, 76 L ed 469; *Utah
Power & Light Co. v. United States,* 243 US 389, 409,
37 S Ct 387, 61 L ed 791; *Causey v. United States,* 240
US 399, 402, 36 S Ct 365, 60 L ed 711.

■ We are brought thus to the determination of the
question whether the State of Oregon, in holding and
dealing with the lands underlying the navigable waters
within its boundaries, does so in its governmental or
in a merely proprietary capacity. These lands were
never granted away by the United States during the
period of territorial government, but were "held as a
whole for the purpose of being ultimately administered
and dealt with for the public benefit by the State" after
it should "have become a completely organized com-
munity." *Shively v. Bowlby,* 152 US 1, 50, 14 S Ct
548, 38 L ed 331, affirming *Bowlby v. Shively,* 22 Or
410, 30 P 154. When, therefore, Oregon was admitted
into the Union, it acquired title to the submerged lands
not by grant from the United States, but by virtue of
its sovereignty. As stated by Chief Justice Taney in
*Martin v. Waddell,* 16 Peters 367, 410, 41 US 234, 10
L ed 997, "when the revolution took place, the people
of each state became themselves sovereign; and in that
character hold the absolute right to all their navigable
waters, and the soils under them, for their own com-
mon use, subject only to the rights since surrendered
by the constitution to the general government." This
is likewise true of the states thereafter admitted into
the Union on "an equal footing" with the original thir-
teen. See *Bowlby v. Shively,* supra, 22 Or at 417. It
should be noted here that, as this court explained in
the *Shively* case, speaking there of tidelands, the
phrase "by virtue of its sovereignty" is not to be taken
as meaning that the state had no right to grant these

lands away. Referring to *Hinman v. Warren,* 6 Or 408, and the court's reliance in that case on *Pollard's Lessee v. Hagan et al,* 3 Howard 212, 44 US 238, 11 L ed 565, Mr. Justice Lord said: "The decision, therefore, is based on the idea that the state has a *jus privatum* in the tide lands, distinguishable from the *jus publicum,* which it may sell so as to convey private interests therein; hence the phrase, by virtue of its sovereignty, was not intended to preclude any private use by the state's grantee which did not interfere with the public rights." 22 Or at 418. These "public rights" are the rights of navigation and fishery and the state has no authority to dispose of the submerged lands in such a manner as to interfere with these rights.

Accordingly, we said in *Winston Bros. Co. v. State Tax Com.,* 156 Or 505, 62 P2d 7, with regard to the lands underlying the navigable waters of the state, that

"* * * although the title passed to the state by virtue of its sovereignty, its rights were merely those of a trustee for the public. In its ownership thereof, the state represents the people, and the ownership is that of the people in their united sovereignty, while the waters themselves remain public so that all persons may use the same for navigation and fishing. These lands are held in trust for the public uses of navigation and fishery, * * *. Being subject to this trust, they are *publici juris*; in other words, they are held for the use of the people at large. * * *" 156 Or at 511.

It was therefore concluded that the state can make no sale or disposal of the soil underlying its navigable waters so as to prevent the use by the public of such waters for the purposes of navigation and fishing. See, also, *Cook v. Dabney,* 70 Or 529, 532, 139 P 721. Our most recent pronouncement on this subject is the

following in *Land Bd. v. West.-Pac. Dredg. Corp.*, 244 Or 184, 416 P2d 667, where we said at page 186: "It has been consistently held that the lands underlying the navigable waters of the state are held by the state in trust for the benefit of the whole people of the state," citing the *Winston Bros.* case.

The concept of a twofold interest of the state—*jus publicum* and *jus privatum*—in the tidelands and the lands underlying the navigable waters derives from the ancient prerogative of the Crown, Gould on Waters (3d ed) § 17. So far as it relates to the submerged lands the doctrine seems to have been abandoned by what was said in the *Winston Bros.* case, above quoted. "In its ownership thereof" we said "the state represents the people, and the ownership is that of the people in their united sovereignty, while the waters themselves remain public so that all persons may use the same for navigation and fishing." 156 Or at 511. It was in accordance with this theory that *Gatt v. Hurlburt*, 131 Or 554, 284 P 172, was decided. In that case the plaintiff contended that he had acquired title to the bed of the Willamette River below the low water mark by adverse possession. This court rejected this contention. The court said:

> "Upon the admission of this state into the Union, the state of Oregon acquired title to all of the lands lying between the ordinary high water mark and the low water mark of all navigable streams affected by the ebb and flow of the tide which are located within its borders. It acquired these lands in its proprietary capacity and became the absolute owner of them and entitled to sell and dispose of them as it saw fit and, as we have seen, the lands bordering upon the Willamette river below high water mark and above low water mark were granted to the owners of the adjacent land. At the same

time that this state was admitted into the Union it acquired title, not in a proprietary capacity but in its sovereign capacity, that is to say as trustee for the public, to all of the bed of navigable streams within its borders. These it could not sell or dispose of or grant the right to make any use of them which would impair or impede navigation. It could and did grant the right to the owners of the land lying above the low water mark to extend wharves between the low water mark and the navigable parts of the river, but this was wholly in aid of commerce and to afford access for the loading and unloading of cargoes, and the transportation of passengers, and other articles of commerce.

"Now, it must be obvious to every one that no person could acquire title by adverse possession to any submerged land lying between the low water mark of a navigable river and the navigable waters, for to do so would be to acquire title by adverse possession against the state. Hence, plaintiff's claim that he has acquired title by adverse possession to a part of the bed of the Willamette river lying below the low water mark and fronting on the property of the Security Savings and Trust company is untenable. The right to navigate these waters is the privilege of every one and the right is common in all and exclusive in no one.

\* \* \* \*. \*

"\* \* \* The title to the soil underlying the water, that is to the bed of the river itself, is vested in the state and is held by the state in its sovereign capacity as trustee for the public and the adverse possession of no person however long continued can divest it of its title." 131 Or at 560-561, 562.

The reasons adduced for this holding apply equally to the claim that laches may be employed as a defense against the state's action of ejectment.

This conclusion accords with the legislative treat-

ment of the beds of navigable rivers. Except for statutes enacted in 1874 and 1876,[2] limited to lands between low and high water marks, the Legislature has never, until 1963, authorized the state to part with title to its river beds. See *State v. McVey*, supra, 168 Or at 347.

In 1920 the Legislature authorized the State Land Board to lease the beds of navigable rivers for the purpose of removing gravel, rock and sand therefrom, the net proceeds of such leases to be paid over to the irreducible school fund: Oregon Laws 1920, ch 32. This statute, with amendments not now material, is still in effect: ORS 274.530. It was enacted, as we said in *Salem Sand & Gravel Co. v. Olcott*, 97 Or 253, 261, 191 P 776, "for the use and benefit of the state in its sovereign capacity."

As stated, provision was made in 1963 for the sale of the beds of navigable rivers, both tidal and nontidal: ORS 274.005 (5); 274.915. We express no opinion as to the validity of this statute. According to the allegations of the complaint the corporation and its predecessors in interest have been taking gravel from the disputed channel since 1920, that is, for 45 years prior to the filing of the ejectment action. During 43 of those years no private person could have acquired title to any portion of the bed of the Willamette River by conveyance from the state. It ought not to be held

---

[2] These statutes were given effect in Pacific Elevator Co. v. Portland, 65 Or 349, 133 P 72, 46 LRA NS 363. By way of what seems to be *caveat* the court said in the concluding paragraph of the opinion:

"The restrictions upon the state conveying land subjacent to the waters of navigable rivers should, we think, generally speaking, apply to lands under navigable waters, or below ordinary low-water mark, or the bed proper of a river as distinguished from its bank or shore as in the Chicago Waterfront case." 65 Or at 402.

that what is, for practical purposes, a conveyance to the corporation, could be accomplished by the negligence of the public officers charged with the duty of asserting the state's rights.

In *State Land Board v. Lee,* 84 Or 431, 434, 165 P 372, we said, through Mr. Justice HARRIS, that the rule that a general statute of limitation does not include the government is not "founded upon the legal fiction expressed in the maxim *nullum tempus occurrit regi;*" but that "sound reason for the rule is found in the fact that as a matter of public policy it is necessary to preserve public rights, revenues and property from injury and loss by the negligence of public officers." Like reasons support the rule which makes unavailable the defense of laches against the government in a suit to enforce a public right or to protect a public interest. Of that character is the state's action in ejectment. The complaint here gives some idea of the magnitude of that interest.

We are of the opinion that the court erred in overruling the demurrer to the complaint.

One other thing remains to be said. It is argued that in any event the demurrer was properly sustained because it admits allegations of the complaint to the effect that the channel of the river flows over private property as the result of an avulsive change in 1909. We have elected to treat the complaint as though it were an equitable answer under the statute. The allegations referred to would have no place in such an answer, but in conformity with the statutory procedure should be separately pleaded, just as the issues made by them would be separately tried out when the equitable defense failed. We have, therefore, considered it proper to ignore purely legal defensive matter in

the complaint and to determine only the validity of the equitable defense of laches.

The decree is reversed and the suit dismissed without prejudice to the corporation's right to enter a plea to the state's complaint in ejectment and to further proceedings in that action conformable to this opinion.

DENECKE, J., specially concurring.

I concur solely upon the ground that laches is only a defense against a party seeking equitable relief and is not available as a defense to a law action of ejectment.

O'CONNELL, J., dissenting.

Plaintiff's suit to enjoin the state's action of ejectment is, in substance, a defensive maneuver resting upon the theory that the state's delay in bringing its action constitutes laches. The principal question is, then, whether the defense of laches can be asserted against the state. There is ample authority in Oregon as well as elsewhere for the general proposition that the defense of laches is available against the state under proper circumstances.[1] Defendant contends, however, that in the cases so holding the state was attempting to enforce a *proprietary* right rather than a *public* right and that when the state brings an action to enforce a public right, as defendant contends it did in

---

[1] Thus in State of Oregon v. Hyde, 88 Or 1, 40, 169 P 757, 171 P 582 (1918), the court said: "We are committed to the principle that the doctrine of laches is applicable to the state: *State v. Warner Valley Stock Co.*, 56 Or. 283, 304 (106 Pac. 780, 108 Pac. 861)."

See also, Withers v. Reed, 194 Or 541, 562, 243 P2d 283 (1952); State ex rel Hallgarth v. School District No. 23, 179 Or 441, 461, 172 P2d 655 (1946); State ex rel Security Savings & Trust Co. v. School District No. 9, 148 Or 273, 287, 31 P2d 751, 36 P2d 179, 181 (1934). Cf., City of Pendleton v. Holman, 177 Or 532, 542-47, 164 P2d 434, 162 ALR 249 (1945).

bringing the ejectment action, the doctrine is not applicable. *State v. Vincent,* 152 Or 205, 52 P2d 203 (1936) and other cases support defendant's contention that laches does not apply to the state when it is enforcing a public right.[2] Plaintiff concedes that the cases so hold. However, plaintiff argues that the present case does not involve a public right but only a proprietary right.

The battle line having been so drawn, the parties then narrow their argument to the issue of whether the state's assertion of its interest in the bed of a navigable stream is the assertion of a public or of a proprietary right. The issue is even more narrowly drawn because plaintiff concedes that rights such as the right of navigation, of fishing, of recreational use of various kinds are public rights, but contends that the right of the state to dispose of the bed of a navigable stream or the gravel therefrom is a proprietary right.[3]

It is now well established that "no satisfactory test has been devised for distinguishing governmental from proprietary functions." 2 Harper & James, Torts § 29.6, pp. 1621-22 (1956). As the authors observe, all of the functions of government "are—or should be— for the public benefit." The immunity of government from suit should not be determined then by attempting to fit the case into one of two categories, whether governmental-proprietary, public-private, or *jus publicum-jus privatum.* Rather, it is necessary to ascertain in each case the interest of the public on one hand and the interest of the person asserting a claim against it on the other, and after weighing these interests de-

---

[2] See In re Estate of Moore, 190 Or 63, 75, 223 P2d 393 (1950).

[3] Plaintiff relies upon the distinction frequently made between the *jus publicum* and the *jus privatum.*

cide which of them should, under the circumstances, be given preference. Sometimes the choice is not difficult to make.[4] Thus, it is easy enough to decide that the interest of the public in having the use of a stream for recreational purposes or for economic purposes in transport shall prevail over the interest of a person who, without license from the state and in the pursuit of private gain, interferes with that public use. But the problem takes on a different complexion when the interests of the entire community do not so clearly predominate. Such is the case when the state undertakes to sell public lands.[5] The only public benefit flowing from such sales is the acquisition of additional money by the state and its eventual use for state purposes. The same is true when the state leases the beds of navigable streams for the purpose of removing gravel. (ORS 274.530). When the state engages in transactions of this kind it should be regarded as standing in no different position than a private person and it should not be accorded any preferential treatment in litigation over such transactions. The point is well stated in 2 Davis, Administrative Law Treatise § 17.01, p. 491 (1958):

> "* * * [O]ne cannot readily see why the government in its business and property dealings should not be subject to the same rules of fairness that the courts apply to others engaging in such dealings. The problem that invites inquiry is: To the extent that the government engages in activities which have a private counterpart, why should the

[4] In those cases where the choice is not difficult the governmental-proprietary rubric may serve the intended policy function. It gives no guidance, however, in cases like the present one where the choice involves a more subtle balancing of public and private interests.

[5] The power of the state to sell land is provided for, e.g., in ORS 273.420, ORS 274.040, and ORS 274.915.

government be immune from a principle of fairness that has been developed to guide the determination of issues between private parties?"

In the present case the real controversy is over the right to the gravel in the channel in question, a type of property which is dealt with by the state in the same manner as such property is dealt with by private persons. Therefore the state should not be given preferential treatment, and the disposition of this case should be controlled by the same "principle of fairness" that would be applicable in litigation between private parties. The doctrine of laches applicable in litigation between private parties should be applied to the state in the proper circumstances.

I believe that there are such circumstances in the present case. Since the state demurred to plaintiff's complaint, the facts relevant to the defense of laches must be garnered from the complaint. The recitation of the facts in plaintiff's complaint can be read to mean that plaintiff had a basis for asserting a claim to the channel in question on the ground that an avulsive movement of the river had occurred; that the state as early as 1933 knew that plaintiff and its predecessor were claiming private ownership in the channel; that the plaintiff has expended a large sum of money in the construction of its plant; and that due to the state's delay in bringing suit the evidence establishing plaintiff's claim is no longer available. These facts are sufficient to establish the defense of laches.[6]

A subsidiary problem remains to be disposed of.

---

[6] See Whitney v. Fox, 166 US 637, 17 S Ct 713, 41 L Ed 1145 (1897); Abraham v. Ordway, 158 US 416, 15 S Ct 894, 39 L Ed 1036 (1895); Foster v. Mansfield, Coldwater Etc. Railroad, 146 US 88, 13 S Ct 28, 36 L Ed 899 (1892); Denison v. McCann, 303

It is argued plaintiff must lose because the state cannot be sued without its consent. Plaintiff's suit, viewed apart from the state's action of ejectment, would be barred by that proscription. But plaintiff's suit is not to be so considered; it is a defensive maneuver made necessary by the state's ejectment action. Plaintiff and defendant are essentially in the same posture here as the parties were in *State v. Shinkle,* 231 Or 528, 373 P2d 674 (1962), except that in the *Shinkle* case the action was at law and a legal defense was raised by answer. There we held that if the state employs the machinery of justice to enforce a claim it is subject to defenses available to other plaintiffs. The same can be said where the defense is raised by a separate suit to enjoin the state's suit or action, as it was in the present case.

Apparently the majority would deny relief to plaintiff even though laches could be asserted against the state; this on the ground "that laches may not be used as a defense against a claim purely legal." If a defendant has an equitable basis for barring recovery by the plaintiff, it is difficult to understand why it should make any difference whether the proceeding he seeks to bar was brought in a court of equity or in a court of law. Although we have retained the distinction between equity and law jurisdiction, it is not necessary to extend the distinction unreasonably.

---

Ky 195, 197 SW2d 248 (1946). As the court points out in *Abraham, supra* 158 US at 421:

"* * * One of the grounds upon which courts of equity refuse relief where the plaintiff is guilty of laches is the injustice of imposing upon the defendant the necessity of making proof of transactions long past, in order to protect himself in the enjoyment of rights which, during a considerable period, have passed unchallenged by his adversary, with full knowledge of all the circumstances."

The majority opinion also holds that even if Corvallis Sand & Gravel Co. had an equitable defense to the ejectment action, it could not be asserted in a separate suit but would have to be raised by answer. ORS 16.460 provides that

"(2) In an action at law where the defendant is entitled to relief, arising out of facts requiring the interposition of a court of equity, and material to his defense, he *may* set such matter up by answer, *without the necessity of filing a complaint on the equity side of the court*; and * * *." (Emphasis added.)

It seems clear from this language that the legislature did not intend to prohibit the raising of an equitable defense by cross bill, if a party chooses to do so. *Churchill v. Meade,* 92 Or 626, 182 P 368 (1919) so holds. There the court said:

"It will be noted that the language of the new enactment is permissive and not mandatory. It allows but does not compel the litigant to interpose in the action at law equitable defenses. This construction is apparent when we read that when the equitable matter is interposed the case shall proceed as a suit in equity until the equitable issues are determined. The effect of this statute is not to change the operation of the old rule giving a party an election to try out his defenses at law and, if unsuccessful, to urge his grounds for equitable relief by a proper suit. It may be said by a figure of speech that the statute opens a new door into chancery through the law courts, whereas before, the entry must have been by a direct suit in that forum. As before, it is a matter of election with the litigant whether he shall initiate his equitable defense in the law action or by an original suit." 92 Or at 632-33.

Later, in *Hopka v. Forbes,* 135 Or 91, 93, 294 P 342 (1931), the court states that "The filing of a cross-

bill by a defendant in a law action, interposing an equitable defense to the action, is no longer permissible under our code." No mention is made of *Churchill v. Meade, supra,* and no attempt is made to explain the language of the statute which, as I have already indicated, is cast in permissive rather than mandatory terms. It seems obvious that the court in *Hopka v. Forbes, supra,* did not carefully consider the matter and for that reason I would not treat it as controlling upon us now.[2]

We should hold that the defense of laches in the present case was properly raised by plaintiff's suit to enjoin the state's action of ejectment.

---

[2] It has been said that the party raising the equitable defense in a separate suit must also be seeking affirmative equitable relief in addition to the injunction restraining the action at law. See 4 Pomeroy, Equity Jurisprudence § 1369 at 990 (5th Ed 1941). I see no reason for this requirement and I do not adopt it. Pomeroy, *supra,* rejects the suggested distinction between a pure defense and one which also seeks affirmative relief. However, even if the requirement were adopted, the prayer in plaintiff's complaint could be construed as a request that its title be quieted though plaintiff regarded its action as "wholly defensive."