Argued and submitted May 7, 1998, certified questions and additional question answered July 29, 1999

# SHASTA VIEW IRRIGATION DISTRICT,
## a municipal corporation,
### *Plaintiff,*

*v.*

# AMOCO CHEMICALS CORPORATION;
## Amoco Chemical Company,
## a corporation a/k/a
## Amoco Chemical Corp;
## Amoco Reinforced Plastics Company,
### *Defendants.*

## (USDC CV9403064-JPC; USCA 96-35869; SC S44723)

986 P2d 536

James M. Duncan, of Perlman & Duncan, Bakersfield, California, filed the brief and argued the cause for plaintiff. With him on the brief was Stanley C. Jones, Jr., of Boivin Jones Uerlings DiIaconi & Oden PC, Klamath Falls.

Roy Pulvers, of Lindsay, Hart, Neil & Weigler, LLP, Portland, argued the cause for defendants. With him on the brief were Jerard S. Weigler, Portland, and Randall S. Henderson, Pasadena, California.

Jas. Adams, Assistant Attorney General, Salem, filed a brief for *amicus curiae* State of Oregon. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

James N. Gardner, of Gardner & Gardner, Portland, and William N. Stiles, of Sussman Shank Wapnick Caplan & Stiles, LLP, Portland, filed a brief for *amici curiae* Associated Oregon Industries, Pharmaceutical Research and Manufacturers of America, and Oregon-Columbia Chapter of the Associated General Contractors of America, Inc.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, Kulongoski, and Leeson, Justices.

LEESON, J.

Durham, J., concurred in part and dissented in part and filed an opinion in which Kulongoski, J., joined.

**LEESON, J.**

This case is before the court on certified questions of
Oregon law from the United States Court of Appeals for the
Ninth Circuit under ORS 28.200 *et seq.* and ORAP 12.20. We
take the following facts from the Ninth Circuit's certification
order:

"Shasta View Irrigation District ('Shasta') was organ-
ized and formed on December 5, 1917, pursuant to Chapter
357 of the Oregon Laws of 1917, now Chapter 545 of the
Oregon Revised Statutes. There are approximately fifty-six
individual members of Shasta. These members own irriga-
ble land within the geographic boundaries of Shasta, and
farm or lease their land to others.

"Under a rehabilitation and betterment project pro-
posed by Shasta, over twenty-one miles of existing unlined
canals were to be replaced with approximately seventeen
miles of buried pressure pipeline. In April 1972, Shasta
entered into a contract with the United States Bureau of
Reclamation. The contract provided that the United States
would loan up to $3.222 million to Shasta for the rehabili-
tation and betterment of the irrigation system. The term of
the loan was sixty-five years.

"In April 1973, Shasta released the bid specifications for
the project. The specifications provided, among other
things, that the pressure pipe used in constructing the irri-
gation system must last for the sixty-five year term of the
loan.

"In June 1973, Shasta entered into a contract for con-
struction of the pressurized irrigation system. The pipe
installation contractor elected to use two different types of
pressure pipe in constructing the system: Techite, a brand
of reinforced plastic mortar pipe manufactured by Amoco
Reinforced Plastics Co. [Amoco] was used in approximately
50,000 feet of the system and an asbestos-cement pipe man-
ufactured by Certainteed Products Corp. was used in
approximately 38,000 feet of the system.

"The Techite was ordered from Amoco * * * between
June and September 1973. Installation of the pipe began in
February 1974 and was completed by June of that year. In
July 1975, Shasta accepted the irrigation system as com-
plete and operational.

"According to Shasta, the Techite pipe has failed approximately twenty-six times, beginning in 1978, with two of the failures occurring before July 1, 1982. On February 16, 1989, Shasta's board of directors voted in favor of pursuing legal action against the manufacturer of the Techite pipe. In 1994, Shasta filed the present action in Oregon superior court [sic], alleging strict product liability, negligence, breach of express warranty and fraud/misrepresentation.

"After removing the action to federal district court on the basis of diversity of citizenship, Amoco filed a motion for summary judgment, claiming that all of Shasta's claims were statutorily time barred. The district court granted summary judgment in favor of Amoco, finding that Shasta was not a 'public corporation' for purposes of statutory time limitations and that, therefore, all of Shasta's claims were time barred by Oregon's Product Liability statutes. [Shasta] timely appealed."

The Ninth Circuit certified the following two questions to this Court:

"1. Is an irrigation district a 'public corporation' for purposes of applying the exemption to applicable limitations set out in [ORS] 12.250? If an irrigation district is a 'public corporation' under [ORS] 12.250, then:

"2. Does [ORS] 12.250's exemption to applicable limitations apply to [ORS] 30.905(1), a statute of ultimate repose outside of [ORS] chapter 12?"

We accepted certification of those questions and, at that time, added an additional question:

3. "If ORS 12.250 does not apply to ORS 30.905(1), then is there a common-law variation of ORS 12.250 that would apply to ORS 30.905(1) to make Shasta's action timely?"

*See Western Helicopter Services v. Rogerson Aircraft*, 311 Or 361, 370-71, 811 P2d 627 (1991) (court has discretion to reframe questions presented). We address the questions in order.

## CERTIFIED QUESTION NO. 1:

"Is an irrigation district a 'public corporation' for purposes of applying the exemption to applicable limitations set out in [ORS] 12.250?"

ORS 12.250 provides:

"Unless otherwise made applicable thereto, the limitations prescribed in this chapter shall not apply to actions brought in the name of the state, or any county, *or other public corporation therein*, or for its benefit."

(Emphasis added.) Shasta contends that the legislature has recognized the public nature of irrigation districts and that several statutes "confirm the general proposition that Oregon law treats irrigation districts like other [public] corporations." Furthermore, Shasta argues, there is no evidence in ORS 12.250 that the legislature intended *not* to extend the protection of ORS 12.250 to irrigation districts. Amoco replies that the text and context of ORS 12.250 leads to the "inescapable conclusion that irrigation districts are not one of the 'other public corporation[s]' entitled to an exemption within the meaning of that statute."

■ To answer the first certified question, we must construe the phrase, "other public corporation therein."[1] The starting point of our analysis is the text and context of the statute, giving words of common usage their plain, natural, and ordinary meaning. *See PGE v. Bureau of Labor and*

---

[1] As noted earlier, the district court granted summary judgment in favor of Amoco on the ground that Shasta is not a "public corporation" for purposes of the statutory time limitation. The dissent claims that it would not answer the first certified question, which deals with whether Shasta is a public corporation, because our answer to the second certified question, with which the dissent agrees, "obviates the need to answer Certified Question No. 1." 329 Or at 165 (Durham, J., dissenting). Although the dissent would not answer the question that has been certified by the Ninth Circuit, curiously it *would* answer a much broader question, namely, whether Shasta is a "public body." 329 Or at 182 (Durham, J., dissenting). The parties did not brief or argue whether Shasta is a public body. The legislature has defined a public body in extraordinarily broad terms in ORS 30.260(4). The dissent apparently would hold that, because Shasta is a public body, it, as with other public bodies, is entitled to rely on what the dissent incorrectly characterizes as the common-law rule of *"nullum tempus occurrit regi."* By answering the first certified question—whether Shasta is a public corporation—we properly avoid answering the broader question that the dissent would raise and answer *sua sponte.*

*Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993) (describing statutory construction methodology).

The term "public corporation" is not a term of common usage, and neither the statute nor ORS chapter 12 defines the term. However, this court has held that a public corporation is a corporation formed for the public's benefit or for a public purpose. *See State ex rel Eckles v. Woolley*, 302 Or 37, 48-49, 726 P2d 918 (1986) (so stating); *see also Black's Law Dictionary*, 1228 (6th ed 1990) (defining public corporation as a municipality or government corporation "created for the administration of public affairs"). This court also has held that "[t]he concept of a 'public corporation' covers a wide variety of institutions," including municipal corporations. *Eckles*, 302 Or at 47.

■ Two words of common usage in ORS 12.250 modify the term "public corporation": "other" and "therein." Based on the express words of the statute, we conclude that the exemption described in ORS 12.250 applies to corporations *in addition* to—or other than—the state and counties that are formed for the public's benefit.

The next inquiry is whether an irrigation district is formed for the public's benefit or for a public purpose. An irrigation district is a corporation formed to foster the beneficial use of water by the public. *See* ORS 545.249 (irrigation district's use of all water, water rights, and rights to appropriate water "declared to be a public use more necessary and more beneficial than any other use"). In *Twohy Bros. Co. v. Ochoco Irr. Dist. et al*, 108 Or 1, 11, 216 P 189 (1923), this court held that an irrigation district is a municipal corporation, because "its property [is] public property and its officers [are] public officers, elected by the legal voters of the irrigation district * * *. Such a district 'is created for a public purpose * * *.' " From the foregoing, we conclude that an irrigation district formed under ORS chapter 545 is a public corporation within the meaning of ORS 12.250.

We answer Certified Question No. 1 "YES."

## CERTIFIED QUESTION NO. 2:

"Does [ORS] 12.250's exemption to applicable limitations apply to [ORS] 30.905(1), a statute of ultimate repose outside of [ORS] chapter 12?"

■ The second certified question subsumes two issues. The first is whether the exemption in ORS 12.250 is restricted to limitations prescribed in ORS chapter 12, or whether the exemption applies outside ORS chapter 12 as well. The second issue is whether the exemption applies to ORS 30.905(1), which is a statute of ultimate repose outside ORS chapter 12.

Shasta argues that the exemption from applicable statutes of limitations applies outside ORS chapter 12, because ORS 12.250 contains a policy reflected in the Latin maxim, "*nullum tempus occurrit regi*," which means that "[t]ime does not run against the [sovereign]." *Black's Law Dictionary* at 1068. Amoco responds that resolution of the issues is a matter of statutory construction. We agree. Consequently, we turn again to the template for statutory construction, looking first to the text and context of the statute. *PGE*, 317 Or at 610.

ORS 12.250, quoted above, consists of a single sentence. The exemption contained in that statute unambiguously refers to "the limitations prescribed in this chapter." *See Chizek v. Port of Newport*, 252 Or 570, 577, 450 P2d 749 (1969) (exemption in ORS 12.250 does not apply outside ORS chapter 12). Consequently, unless some other statute were to make the exemption contained in ORS 12.250 applicable to a proceeding outside ORS chapter 12, that exemption applies only to the limitations contained in ORS chapter 12.

We next inquire whether ORS 30.905(1) itself makes the exemption in ORS 12.250 applicable. ORS 30.905(1) provides:

"Notwithstanding ORS 12.115 or 12.140 and except as provided in subsection (2) of this section and ORS 30.907 and 30.908(1) to (4), a product liability civil action shall be commenced not later than eight years after the date on which the product was first purchased for use or consumption."

By its express terms, ORS 30.905(1) does not make the exemption in ORS 12.250 applicable to the ultimate repose period for commencing a products liability civil action. The only reference in ORS 30.905(1) to limitation periods contained in ORS chapter 12 is that the ultimate repose period in ORS 30.905(1) applies notwithstanding—that is, in spite of—the limitations contained in ORS 12.115[2] and ORS 12.140.[3] Thus, the text indicates that the legislature did not intend that the exemption in ORS 12.250 apply to the ultimate repose period in ORS 30.905(1).

We conclude that the exemption granted to the state, counties and other public corporations by ORS 12.250 does not apply to the statute of ultimate repose in ORS 30.905(1).

We answer Certified Question No. 2 "NO."

ADDITIONAL QUESTION NO. 3:

"If ORS 12.250 does not apply to ORS 30.905(1), then is there a common-law variation of ORS 12.250 that would apply to ORS 30.905(1) to make Shasta's action timely?"

We note at the outset that the question is not whether there are any common-law rules that might be relevant to the analysis in this case. Rather, the question is whether there is a common-law variation of ORS 12.250 that might be relevant in analyzing Shasta's claim. There is.

The common-law variation of ORS 12.250 is that general statutes of limitations do not run against the government unless the statute "otherwise expressly provide[d]." *State v. Warner Valley Stock Co.*, 56 Or 283, 308, 108 P 861 (1910); *see also Corvallis Sand & Gravel v. Land Board*, 250 Or 319, 338, 439 P2d 575 (1968) (stating same rule). In *State*

---

[2] ORS 12.115 provides:

"(1) In no event shall any action for negligent injury to person or property of another be commenced more than 10 years from the date of the act or omission complained of.

"(2) Nothing in this section shall be construed to extend any period of limitation otherwise established by law, including but not limited to the limitations established by ORS 12.110."

[3] ORS 12.140 provides:

"An action for any cause not otherwise provided for shall be commenced within 10 years."

*Land Board v. Lee*, 84 Or 431, 434, 165 P 372 (1917), this court explained:

> "Th[e] rule is said to be founded upon the legal fiction expressed in the maxim *nullum tempus occurrit regi*. However, it is not necessary to predicate this salutary precept upon any fiction, since sound reason for the rule is found in the fact that as a matter of public policy it is necessary to preserve public rights, revenues and property from injury and loss by the negligence of public officers * * *."

Oregon originally recognized governmental exemption from general statutes of limitations afforded by the common law. *State Land Board*, 84 Or at 435. However, in 1862, the legislature abolished the rule by enacting Section 13, Deady's Code, which provided:

> "The limitations prescribed in this title *shall apply* to actions brought in the name of the state, any county or other public corporation therein, or for its benefit, in the same manner as to actions by private parties."

General Laws of Oregon, ch 1, § 13, p 142 (Deady 1845-1864) (emphasis added). Under Section 13, the state, counties, or other public corporations lost their common-law exemption from the running of general statutes of limitations. In 1903, the legislature restored that exemption from the running of most statutes of limitations by amending Section 13 as follows:

> "The limitation prescribed in this title shall *not* apply to actions brought in the name of the state, or any county, or other public corporation therein, or for its benefit * * *."

Lord's Oregon Law, v I, title I, ch II, § 13, p 140 (1903) (emphasis added). In other words, between 1862 and 1903, the legislature expressly consented to the application of statutes of limitations against the state, any county, or other public corporation. However, in 1903, the legislature revived and codified a version of the common-law rule that general statutes of limitations do not apply to those entities, unless the statute expressly or by necessary implication provides otherwise. *State Land Board*, 84 Or at 436.

With the exception of the introductory clause, which was added in 1953, the text of section 13 has remained

unchanged since its amendment in 1903. That exemption from general statutes of limitations for the state, counties, or other public corporations currently is codified at ORS 12.250.

As explained in the analysis of the second certified question, the exemption in ORS 12.250 is limited to statutes of limitations contained in ORS chapter 12, unless the legislature expressly makes ORS 12.250 applicable outside ORS chapter 12. Nonetheless, the reasoning behind the common-law exemption has guided this court in determining whether a statute of limitations outside ORS chapter 12 bars an action brought on behalf of the state, county, or other public corporation. For example, in *State Land Board*, the question was whether the running of a ten-year statute of limitations in General Laws of Oregon 1913, chapter 304, barred the State Land Board from foreclosing on a mortgage lien. This court held that the statute did not bar the State Land Board's action, because the court viewed the statute "in the light of the previously declared policy of the state," *id.* at 436, namely, that "it is necessary to preserve public rights, revenues and property from injury and loss by the negligence of public officers." *Id.* at 434; *accord Chizek*, 252 Or at 578 (public would not be served if claim of Port of Newport, as a public body, were barred by statute of limitations in ORS 312.230); *cf. Withers et al v. Reed*, 194 Or 541, 556-57, 243 P2d 283 (1952) (forfeiture statute applies against state, because common-law exemption from limitation periods is not applicable where negligence of public officials harms public good).

With that background, we turn to whether the common-law exemption applies to exempt Shasta from the operation of ORS 30.905(1). To resolve that issue, we must analyze the purposes underlying statutes of limitations and statutes of ultimate repose.

Statutes of limitations "limit[ ] the time a party has to initiate an action once a claim has accrued." *Sealey v. Hicks*, 309 Or 387, 394 n 7, 788 P2d 435 (1990); *see also Baker v. Kennedy*, 317 Or 372, 376, 856 P2d 314 (1993) ("Statutes of limitation refer to *commencement* of legal actions.") (emphasis in original). Generally, a statute of limitations does not begin to run until the injured party knows or should know that it has been injured. *Gaston v. Parsons*, 318 Or 247, 259,

864 P2d 1319 (1994). *But see Huff v. Great Western Seed Co.*, 322 Or 457, 464, 909 P2d 858 (1996) (plaintiff's belated discovery of employer's unlawful motive does not delay commencement of statutory limitations period in case brought under ORS 659.121(1)). The expiration of a statute of limitations is an affirmative defense to an action. ORCP 19 B. However, statutes of limitations can be waived, *Multnomah County v. Dept. of Rev.*, 325 Or 230, 234, 935 P2d 426 (1997), and various circumstances can toll their expiration. *See, e.g.*, *Baker*, 317 Or at 374 (statute is tolled if insurer fails to give injured party timely notice of running of statute of limitations after making advance payment for damages). In sum, although statutes of limitations may affect a plaintiff's ability to enforce a remedy, the running of such statutes does not extinguish a right. *See Evans v. Finley*, 166 Or 227, 233, 111 P2d 833 (1941) (so stating); *Goodwin v. Morris*, 9 Or 322, 324 (1881) (same).

 The legislature enacts statutes of ultimate repose to supplement applicable statutes of limitations. *DeLay v. Marathon LeTourneau Sales*, 291 Or 310, 315, 630 P2d 836 (1981). The legislature enacted Oregon's first statute of ultimate repose in 1967. *Id.* Statutes of ultimate repose set maximum times to file a claim, regardless of the date of discovery of an injury or other circumstances that may affect the expiration of a statute of limitations. *See Josephs v. Burns & Bear*, 260 Or 493, 498, 491 P2d 203 (1971) (statute of ultimate repose in ORS 12.155(1) intended to provide overall maximum time limitation); *see also DeLay*, 291 Or at 314-15 (medical malpractice statute of ultimate repose not tolled by the plaintiff's insanity). An ultimate repose period "provides a deadline for the initiation of an action whether or not the injury has been discovered or has even occurred." *Sealey*, 309 Or at 394 n 7. Unless otherwise provided by statute, an ultimate repose period "cannot be extended regardless of unfairness to the plaintiff." *DeLay*, 291 Or at 315. Once an ultimate repose period has expired, the claim is extinguished and no legally cognizable injury exists. *See Sealey*, 309 Or at 392 (so declaring with respect to products liability statute of ultimate repose).

 The legislature enacted ORS 30.905(1) in 1977. This court previously has explained that

"ORS 30.905 was the result of a major 1977 lobbying effort by business and insurance organizations for reform of the common law of products liability. The perceived problem was the high cost of liability insurance. One of the legislative solutions was to fix a limited and predictable time period in which a manufacturer, distributor, seller or lessor would be exposed to a product liability civil action."

*Erickson Air-Crane Co. v. United Tech. Corp.*, 303 Or 281, 286, 735 P2d 614 (1987). This court further explained that the assumption throughout the legislative consideration of the statute was that "manufacturers, distributors, sellers and lessors should have the benefit of a limited and predictable time period during which they would be exposed to liability for defects that existed when the product left a respective party's hands." *Id.* at 288. ORS 30.905(1) establishes that time period as eight years.

In *Sealey*, this court held that ORS 30.905(1) reflects the legislature's determination "that an injury occurring more than eight years after a defective product first entered the stream of commerce *is not legally cognizable*." 309 Or at 392 (emphasis added). The court also declared that enactment of ORS 30.905(1) was within the legislature's authority "to determine what constitutes a legally cognizable injury." *Id.* at 394.

As discussed above, the court explained in *State Land Board* the common-law rule that the government is not included in general statutes of limitations, unless included expressly or by necessary implication. 84 Or at 434. The public policy reason for the exemption is to protect the public from the negligence of public officials who fail to assert claims in a timely manner after they discover, or should have discovered, an injury. *Id.* Consistent with that policy, the exemption means that governments' ability to enforce legal remedies is not affected if public officials are negligent in failing to assert claims.

ORS 30.905(1), by contrast, reflects a legislative judgment that an injury occurring eight years after a defective product first enters the stream of commerce is not legally

cognizable because, after that time, *all* claims are extinguished. *Sealey*, 309 Or at 392. Unlike a statute of limitations, the eight-year ultimate repose period prescribed by that statute begins to run on the date on which a product first is purchased for use or consumption, not on the date on which a purchaser knows or should have known of an injury caused by the product. The eight-year statute of ultimate repose runs whether or not a public official or any other plaintiff fails to assert a claim in a timely manner. The public policy for exempting governments from statutes of limitations therefore does not apply to statutes of ultimate repose. That is so, because the expiration of ultimate repose periods extinguishes all claims irrespective of whether the injured plaintiff was negligent in failing to assert claims in a timely manner.

In sum, because ORS 30.905(1) is not premised on whether a plaintiff has filed a claim in a timely manner and because the expiration of the ultimate repose period extinguishes a claim under ORS 30.900 *et seq.*, the common-law exemption that underpins ORS 12.250 does not apply to ORS 30.905(1). We conclude that the common-law variation of ORS 12.250 does not apply to ORS 30.905(1).

We answer Additional Question No. 3 "NO."

## CONCLUSION

For the reasons explained above, we conclude that an irrigation district is a public corporation under ORS 12.250. The exemption in ORS 12.250 does not apply to ORS 30.905(1). The common-law variation of ORS 12.250 does not apply to ORS 30.905(1).

Certified questions and additional question answered.

**DURHAM, J.,** concurring in part and dissenting in part.

I concur in the majority's answer to the second certified question, which asks:

"2. Does [ORS] 12.250's exemption to applicable limitations apply to ORS 30.905(1), a statute of ultimate repose outside of [ORS] chapter 12?"

The exemption in ORS 12.250[1] is unambiguous and applies only to "the limitations *prescribed in this chapter*." (Emphasis added.) The emphasized phrase refers only to ORS chapter 12. The exemption in ORS 12.250 has no effect on the deadline for commencing a product liability action in ORS 30.905(1)[2] because that deadline is not a time limitation prescribed in ORS chapter 12. *See Chizek v. Port of Newport*, 252 Or 570, 577, 450 P2d 749 (1969) (ORS 12.250 is inapplicable to the statute of limitation enacted in ORS 312.230, because that limitation is not prescribed in ORS chapter 12). Neither ORS 30.905(1) nor any other statute suggests that the legislature incorporated ORS 12.250 into ORS 30.905(1). Consequently, ORS 12.250 has no effect on the applicability of ORS 30.905(1) to this dispute. The majority correctly answers Certified Question No. 2 "no."

The majority's answer to Certified Question No. 2 obviates the need to answer Certified Question No. 1. Because the exemption in ORS 12.250 is not applicable to ORS 30.905(1), no useful purpose is served by deciding, in response to Certified Question No. 1, whether an irrigation district is a "public corporation" under ORS 12.250. I would not answer Certified Question No. 1 because the majority's analysis and answer to Certified Question No. 2 renders Certified Question No. 1 moot.

As I understand it, the majority claims that Certified Question No. 1 raises a genuine controversy for two reasons: (1) that question was certified to this court by the United States Court of Appeals for the Ninth Circuit, and (2) the answer to Certified Question No. 1 somehow obviates the

---

[1] ORS 12.250 provides:

"Unless otherwise made applicable thereto, the limitations prescribed in this chapter shall not apply to actions brought in the name of the state, or any county, or other public corporation therein, or for its benefit."

[2] ORS 30.905 provides:

"(1) Notwithstanding ORS 12.115 or 12.140 and except as provided in subsection (2) of this section and ORS 30.907 and 30.908(1) to (4), a product liability civil action shall be commenced not later than eight years after the date on which the product was first purchased for use or consumption.

"(2) Except as provided in ORS 30.907 and 30.908(1) to (4), a product liability civil action shall be commenced not later than two years after the date on which the death, injury or damage complained of occurs."

need to answer an unspecified aspect of Certified Question No. 3. 329 Or at 156 n 1. Those assertions evade rather than answer the problem of mootness.

Unless the court's decision in the matter before it will have some practical effect on the rights of the parties to the controversy, the question—including a certified question—is moot. *See Barcik v. Kubiaczyk*, 321 Or 174, 182, 895 P2d 765 (1995) (a justiciable controversy exists when the parties' interests are adverse and the court's decision will have some practical effect on the parties' rights); *Brumnett v. PSRB*, 315 Or 402, 405-06, 848 P2d 1194 (1993) (applying same standard).

This court has a responsibility, before it decides *any* issue before it, to insure that the issue is justiciable and has not become moot. The majority violates that responsibility here because it has not, *and cannot*, demonstrate that its answer to Certified Question No. 1 will have any practical effect on the rights of the parties. The bare fact that another court certifies a question to this court does not establish that the parties have a legally cognizable interest in the answer. The majority has no license to answer a moot question simply because another court has certified it to this court.

The majority's second reason for answering Certified Question No. 1 is not correct. Whether Shasta View is a "public corporation" under ORS 12.250 has not the slightest relationship to any issue that arises under Additional Question No. 3. Nothing in this opinion suggests to the contrary. Certified Question No. 1 concerns the *legislature's* intention in enacting an exemption in ORS 12.250 for a "public corporation" from the limitations specified in ORS chapter 12. Additional Question No. 3 concerns the eligibility of certain public bodies for protection against the application of ORS 30.905(1) under certain well-established *common-law* rules of statutory construction. In no way does the answer to the first question assist the court in resolving any aspect of the third question. The majority's related claim that it must answer Certified Question No. 1 in order to *avoid* answering some unspecified aspect of Additional Question No. 3 that the majority asserts should not be answered is baffling. That

argument fails to confront the mootness problem that inheres in Certified Question No. 1.

Certified Question No. 1 is moot and the majority's answer to that question is *dictum*. Accordingly, I dissent from the majority's decision to decide Certified Question No. 1.

The Additional Question No. 3 asks:

"If ORS 12.250 does not apply to ORS 30.905(1), then is there a common-law variation of ORS 12.250 that would apply to ORS 30.905(1) to make Shasta's action timely?"

Shasta View argues that, under the common law recognized and applied in this court's decisions, special rules apply to the construction of statutes of general applicability, such as ORS 30.905(1), that could operate to deprive a public body of its right to commence litigation to protect its interests. According to Shasta View, this court follows what it calls a "default" approach to interpreting such statutes, *viz.*, that the court will construe such statutes not to apply to limit the right of a public body to commence an action unless the statute, either expressly or by necessary implication, applies to the public body. *Amicus curiae* State of Oregon supports Shasta View's position.[3]

The task of determining whether certain public bodies are exempt from the operation of ORS 30.905(1) is an exercise in statutory construction. Under the methodology described in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993), the court first examines the text and context of the statute, including, as pertinent here, rules of construction found "in the case law" that bear directly on how to interpret the text in context. Because the text of ORS 30.905(1) says nothing, one way or the other, regarding the applicability of ORS 30.905(1) to a public body's product liability claim, the exemption that plaintiff and *amicus* urge,

---

[3] The State of Oregon argues:

"[T]he state's interest is to support the common law doctrine, which provides the legislature's 'default mode' as to whether statutes of general application apply to governmental entities, absent express provision therefor. Longstanding Oregon law, and the statutory context of the Oregon Revised Statutes, establish that such statutes do not include the government, unless governmental entities are included by express reference or such a result is compelled by necessary implication."

if it exists, must be found in case law that directs how to construe a statute such as ORS 30.905(1) in the context of its application to a public body.

I note at the outset that this court's inquiry, in response to Additional Question No. 3, into the substance and effect of the English common law has a state constitutional sanction. Oregon's provisional government adopted the common law of England by statute before Oregon became a territory or a state. *State v. Hansen*, 304 Or 169, 172, 743 P2d 157 (1987), *citing* Act of July 5, 1843, Art 12, *reprinted in* Lawrence T. Harris, *History of the Oregon Code*, 1 Or L Rev 129, 135 (1922); Act of June 27, 1844, Art III, § 1, *reprinted in id.* at 138. *Lytle et al. v. Hulen et al.*, 128 Or 483, 510, 275 P 45 (1929), states:

> " 'The common law of England and principles of equity, not modified by the statutes of Iowa or of this government, and not incompatible with its principles, shall constitute a part of the law of this land.' Or. L. 1843, 49 p. 100, Act of June 27, 1844.

> "The foregoing statute continued and remained in effect when the Constitution of Oregon was adopted in 1859. Article XVIII, Section 7 of the Oregon Constitution provides:

> " 'All laws in force in the territory of Oregon when this constitution takes effect, and consistent therewith, shall continue in force until altered or repealed.'

> "Hence the Act of June 27, 1844, and Section 7 of Article XVIII of the Constitution constitute a statutory and constitutional declaration that the common law of England, unless modified by the statutes of Iowa when the Act of June 27, 1844, was enacted, or subsequently modified by the statute of Oregon, and not incompatible with the principles of our government, shall constitute a part of the law of Oregon: *Peery v. Fletcher*, 93 Or. 43, 52 (182 Pac. 143); *In re Water Rights of Hood River*, 114 Or. 112, 166 (227 Pac. 1065)."

Article XVIII, section 7, continued in force the substantive principles of the English common law, although it did not enact any particular common-law rule into law. *See Land Bd. v. Corvallis Sand & Gravel*, 283 Or 147, 156-57, 582 P2d 1352 (1978) (so noting). Instead, that constitutional

provision requires this court to decide whether a particular principle of the common law is enforceable in a particular case by inquiring whether the common-law rule is compatible with, among other things, Oregon's political institutions and state and federal law.

> "We have held that by force of our constitution and statutes (§7, Art. XVIII, Oregon Const.; Law of Oregon, 1843-1849, p. 100) the common law of England, modified and amended by English statutes, as it existed at the time of the American Revolution, was adopted and is in force in this state, as far as it was general and not local in its nature, was applicable to the conditions of the people, and was not incompatible with the nature of our political institutions, or in conflict with the constitution and laws of the United States or of this state."

*In re Estate of Moore*, 190 Or 63, 70, 223 P2d 393 (1950) (citations omitted). *See also Peery v. Fletcher*, 93 Or 43, 52-53, 182 P 143 (1919):

> "[The common law of England] has been adopted so far only as its general principles were suited to the habits and conditions of the colonies, and in harmony with the genius, spirit and objects of American institutions. Different geographical conditions may justify modifications, and whether common-law rules will be followed strictly in the United States will, necessarily, where no vested rights are actually concerned, depend upon the extent to which they are reasonable and in consonance with public policy and sentiment. What may be the common law in one state is not necessarily so considered in another. In many jurisdictions in the United States the rules of the common law of England have been held by the courts to be in full force so far as the same are applicable and of a general nature, and are not in conflict with the Constitution or special enactments of the legislature. This is the rule in Oregon[.]"

(Citations omitted.)

To the extent that the English common law attributed prerogative rights to the English king, this court attributes those prerogative rights, wherever applicable, to the people of this state. In *Fidelity etc. Co. v. State Bank of Portland*, 117 Or 1, 4-5, 242 P 823 (1926), after citing *United*

*States F. & G. Co. v. Bramwell*, 108 Or 261, 217 P 332 (1923), this court stated:

> "In that case we held that the people of this state have succeeded to all of the incidental prerogative rights of the British Crown, which are essential to the efficient exercise of the powers inherent in the nature of civil government. * * * It is our understanding that we are as much bound by the applicable rules of the common law, where such rules have not been modified, or abrogated by statute, as we are by the statutes themselves."

This court has cited repeatedly two common-law rules, analyzed below, regarding interpretation of statutes of general applicability that, when applied to a public body, could restrict the right of the government to pursue its claims. This court's invocation of those rules in a variety of settings to protect public bodies demonstrates that they are compatible with the nature of our political institutions and not in conflict with the constitution and laws of the United States or of this state, within the meaning of *Moore* and *Peery*. Accordingly, those rules "shall continue in force until altered or repealed," as required by Article XVIII, section 7, of the Oregon Constitution. In enacting ORS 30.905(1), the legislature did not alter or repeal those common-law rules and, therefore, this court must apply those rules to discern the legislature's intention in enacting that statute.

With that body of state constitutional law in mind, I turn to a consideration of the content of the English common-law rules that bear on additional Question No. 3.

1. *The rule against inclusion of government.*

The first rule, denominated as the rule against inclusion of government in this court's cases,[4] was described in *Peninsula Dr. Dist. No. 2 v. Portland et al*, 212 Or 398, 418, 320 P2d 277 (1958):

> "[I]t is generally held that 'Neither the government, whether federal or state, nor its agencies are considered to be within the purview of a statute unless an intention to

---

[1] *See Withers, et al. v. Reed*, 194 Or 541, 551-52, 243 P2d 283 (1952) (discussing "the rule against inclusion of government" and quoting G.A. Endlich, *A Commentary on the Interpretation of Statutes* § 167 at 232 (1888)).

include them is clearly manifested; and the rule applies, or applies especially, to statutes which would impair or divest the rights, titles, or interests of the government.' "

(Citations omitted.) For an application of that principle, see *Coos County v. State of Oregon*, 303 Or 173, 194-95, 734 P2d 1348 (1987) (conclusive statutory presumption of satisfaction of real property mortgage lien in ORS 88.110 does not bind the state). *See also United States F. & G. Co.*, 108 Or at 269, in which the court, after noting that certain common-law rules regarding the king's royal character and authority were not in force in this country, stated:

"But those incidental prerogatives which had no relation to the king's person and constituted exceptions in favor of the crown to general rules applicable to everyone else, and which, from their very nature, are essential to the welfare of the people of the state, have been adopted, and the common-law rules by which these rights were established, have become the law of the state. *Among those so adopted are the common-law rules that general words in a statute do not include the state unless the state is expressly named therein*; that the state cannot be sued without its consent; *that the statute of limitations does not run against the state in the absence of a statute permitting it*;[5] * * * To all of the incidental prerogative rights of the British Crown, which are essential to the efficient exercise of the powers inherent in the nature of civil government, the people of this state have succeeded."

(Emphasis added.)

Common-law judges developed those interpretive principles to protect the prerogative of the king, as a constituent part of both the executive and legislative powers of the English government, to take action in the public interest unless a statute, enacted with the king's consent, expressly restricted the king's authority to act. Sir William Blackstone described the principle against the inclusion of government as follows:

---

[5] The third cited common-law rule, *"nullum tempus occurrit regi,"* (literally, "no time runs against the king") is discussed in detail later in this opinion.

"[I]n domestic affairs, [the king] is considered in a great variety of characters, and from thence there arises an abundant number of other prerogatives.

"First, he is a constituent part of the supreme legislative power; and, as such, has the prerogative of rejecting such provisions in parliament, as he judges improper to be passed. The expediency of which constitution has before been evinced at large. I shall only further remark, that *the king is not bound by any act of parliament, unless he be named therein by special and particular words. The most general words that can be devised ('any person or persons, bodies politic, or corporate, etc.') affect not him in the least, if they may tend to restrain or diminish any of his rights or interests.* For it would be of most mischievous consequence to the public, if the strength of the executive power were liable to be curtailed without its own express consent, by constructions and implications of the subject. Yet, where an act of parliament is expressly made for the preservation of public rights and the suppression of public wrongs, and does not interfere with the established rights of the crown, it is said to be binding as well upon the king as upon the subject: and, likewise, the king may take the benefit of any particular act, though he be not especially named."

William Blackstone, *Commentaries* \*262 (emphasis added).

*Craies on Statute Law*, 423 (S. G. G. Edgar ed., 7th ed 1971) presents the following further explanation of that common-law rule:

"3. Crown Not Bound by Statute Unless Specially Named, or Clearly Intended

"The history of legislation is to a large extent a history of the restriction of the royal prerogative, but *'it is a well-established rule, generally speaking, in the construction of Acts of Parliament, that the King is not included unless there are words to that effect; for it is inferred prima facie that the law made by the Crown, with the assent of the Lords and Commons, is made for subjects, and not for the Crown.'* 'This general rule, as expressed in Bacon's *Abridgment*, is that, *"where a statute is general, and thereby any prerogative, right, title or interest is divested or taken from the King, in such case the King shall not be bound, unless the statute is made by express terms to extend to him."* ' The rule is analogous, if not equivalent, to the rule already stated, that

the common law is not presumed to be altered by statute, for the rights and titles and prerogatives of the Crown are in reality part of the common law of England. The reason of the rule is thus put by Plowden 240: *'Because it is not an Act without the King's assent, and it is to be intended that when the King gives his assent he does not mean to prejudice himself or to bar himself of his liberty and his privilege, but he assents that it shall be a law among his subjects.'* "

(Footnotes omitted; emphasis added.)

Most of this court's cases have applied the formulation of the rule stated in the *Peninsula Dr. Dist No. 2, United States F. & G. Co.*, and *Coos County* cases cited above.[6] *See Seton v. Hoyt*, 34 Or 266, 273, 55 P 967 (1899), which applies that rule in favor of a county:

"Nor is the state within the purview of a general law regulating the rate of interest upon money due or to become due, and this goes upon the ground that *a sovereign is not bound by the words of a statute unless it is expressly named.* That the county is but the agent or instrumentality of the state, constituted and employed essentially for the promotion of its general government, and, therefore, subject to like rules and restrictions governing its liabilities as the state, there can be no controversy."[7]

(Citations omitted; emphasis added.) *See also State Land Board v. Campbell*, 140 Or 196, 197-98, 13 P2d 346 (1932):

---

[6] The legislature is well aware of the rule against inclusion of government and takes that rule into account in the lawmaking process. For example, consider the definition of the important term "organization" in the Uniform Commercial Code (UCC), ORS 71.2010(28):

" 'Organization' includes a corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership or association, two or more persons having a joint or common interest, or any other legal or commercial entity."

In drafting that definition, the legislature clearly expressed its intention to apply the UCC to public bodies. It did not leave to the processes of interpretation and inference the question whether the final phrase of the definition, "any other legal * * * entity," was adequate to include public bodies.

[7] The rationale followed in *Seton*, 34 Or at 273, which applied the rule against inclusion of government to protect a county, applies with equal force here to protect plaintiff. Irrigation districts exist under state law, ORS 545.001 *et seq.* (Irrigation District Law), to facilitate local administration of a precious resource, water. *See also Chizek*, 252 Or 576-78 (applying the closely related rule, *nullum tempus occurrit regi*, to protect a public body, *i.e.*, the Port of Newport).

"It is a universally accepted rule that words of a statute applying to private rights do not affect those of the state, and that the sovereign authority is not bound by the general language of a statute which tends to restrain or diminish the powers, rights or interests of the sovereign, and when the rights of a commonwealth are to be transferred or affected, the intention must be plainly expressed or necessarily implied * * *."

(Citations omitted.) *See also State v. McVey*, 168 Or 337, 348, 121 P2d 461, *on reh'g* 123 P2d 181 (1942) (quoting Pennsylvania case law):

" 'Legislative enactments presumptively affect only private rights and do not embrace the rights of a sovereign unless the sovereign is explicitly designated or clearly intended.' "

One Oregon case indicates that the rule is subject to an exception, as described by Blackstone in the passage of his work quoted above, for statutes

"expressly made for the preservation of public rights and the suppression of public wrongs [that do] not interfere with the established rights of the crown * * *."

In *Withers*, 194 Or at 556-60, this court held that a five-year water right forfeiture statute did apply to the state. According to *Withers*, that construction returned water to legally required beneficial use and minimized waste of water, thereby safeguarding a precious public resource and achieving a benefit for the public as a whole, in conformance with legislatively declared public policy and prior case law.

*Withers* recognized the rule against inclusion of government but concluded that an exception to that rule governed the outcome of the particular dispute before the court. The exception applied in *Withers* safeguarded the public interest by promoting the statutorily required beneficial use of water and by deterring the long-term waste of water by the state.

Enforcement of ORS 30.905(1) against Shasta View protects no public interest equivalent to that involved in *Withers*. Analyzed in Blackstone's terms, ORS 30.905(1) does not "preserve a public right" or "suppress a public wrong" in

barring a claim by a public body. Applying the criteria considered in *Withers*, I conclude that the rule against inclusion of government, and not the exception noted in *Withers*, is the pertinent rule governing construction of ORS 30.905(1) in the context of its application to a claim by Shasta View.

What is the majority's response to the question of the proper application of the rule against the inclusion of government to this dispute? In a word: nothing. The majority fails to address the applicability of the rule against inclusion of government. That failure is the result of the majority's inexplicably narrow reading of the third question.

ORS 12.250 exempts certain public bodies from the operation of statutes of limitation in ORS chapter 12, unless a specific statute provides otherwise. The third question simply asks whether Oregon common law provides any analogous exemption from the operation of ORS 30.905(1). Because the rule against inclusion of government protects public bodies from the effect of statutes that diminish their rights, powers and interests, unless the statute applies to the government expressly or by necessary implication, that rule is well within the scope of Additional Question No. 3. The majority incorrectly refuses to discuss the rule in this case.

The majority disregards the practical legal problem that now confronts the Ninth Circuit. *This court*, not the Ninth Circuit, drafted the third question to provide the vehicle for advising the Ninth Circuit about Oregon rules of statutory interpretation that, like ORS 12.250, may exempt Shasta View from the operation of ORS 30.905(1) and, therefore, prevent the dismissal of Shasta View's complaint. The third question exercise is designed to assist the Ninth Circuit in answering one legal issue: under Oregon law, is Shasta View's complaint subject to dismissal because it is filed untimely under ORS 30.905(1)? The majority's crabbed reading of the third question leads it to deprive the Ninth Circuit of one of the specific legal determinations about Oregon law that it needs to decide correctly whether to affirm or reverse the dismissal of Shasta View's complaint. On learning that the majority of this court will not discuss or apply the rule against inclusion of government, the Ninth Circuit justifiably

may ask: what was the point of all this? The majority's position is as unhelpful and impractical as it is legally incorrect.

The majority's failure to analyze and apply the rule against inclusion of government in this proceeding leaves the Ninth Circuit free to do so. But the very point of this proceeding was to eliminate, for the benefit of the Ninth Circuit, any uncertainty about whether Shasta View's complaint is subject to dismissal under Oregon law. It is in regard to that point that the majority opinion and this opinion part company. The majority is satisfied to perpetuate the Ninth Circuit's uncertainty about Oregon law. I am not.

ORS 30.905(1) is silent regarding its application in the context of an action brought by a public body, such as Shasta View. If enforced here, that statute would deprive Shasta View of its right to secure a remedy for a defective product and thereby protect the interest of the public that Shasta View serves. That is the precise circumstance to which the common-law rule against inclusion of government most obviously applies. The Ninth Circuit should enforce that rule here. Certainly nothing in the majority's opinion prevents it from doing so.

### 2. *Nullum tempus occurrit regi.*

The second common-law rule is similar in nature and represents a particular application of the first. In *State Land Board v. Lee*, 84 Or 431, 434, 165 P 372 (1917), this court stated:

> "[I]t is a rule of universal recognition that the government is not included in a general statute of limitation unless it is expressly or by necessary implication included. This rule is said to be founded upon the legal fiction expressed in the maxim *nullum tempus occurrit regi*. However, it is not necessary to predicate this salutary precept upon any fiction, since sound reason for the rule is found in the fact that as a matter of public policy it is necessary to preserve public rights, revenues and property from injury and loss by the negligence of public officers * * *."

(Citations omitted.)

In *Withers*, 194 Or 544-46, this court, referring to both common-law rules discussed above,[8] quoted Judge Story's "classic exposition of the doctrine" in *United States v. Hoar*, 26 F Cas 329, 2 Mason 311, 313 (CCD Mass 1821) (No 15,373):

> " 'The true reason, indeed, why the law has determined, that there can be no negligence or laches imputed to the crown, and, therefore, no delay should bar its right, (though sometimes asserted to be, because the king is always busied for the public good, and, therefore, has not leisure to assert his right within the times limited to subjects,) is to be found in the great public policy of preserving the public rights, revenues, and property from injury and loss, by the negligence of public officers. And though this is sometimes called a prerogative right, it is in fact nothing more than a reservation or exception, introduced for the public benefit, and equally applicable to all governments. * * *

> " 'But, independently of any doctrine founded on the notion of prerogative, the same construction of statutes of this sort ought to prevail, founded upon the legislative intention. Where the government is not expressly or by necessary implication included, it ought to be clear from the nature of the mischiefs to be redressed, or the language used, that the government itself was in contemplation of the legislature, before a court of law would be authorized to put such an interpretation upon any statute. In general, acts of the legislature are meant to regulate and direct the acts and rights of citizens; and in most cases the reasoning applicable to them applies with very different, and often contrary force to the government itself. It appears to me, therefore, to be a safe

---

[8] *Withers* did not treat separately the two common-law rules discussed in this opinion, but analyzed them together as somewhat different applications of one "general rule" that it described as follows:

"Reed relies upon the principle crystalized in the legal maxim, *nullum tempus occurrit regi*. The general rule is thus stated in 3 Sutherland, Statutory Construction 3d ed, 183, § 6301:

" 'General words or language of a statute that tends to injuriously encroach upon the affairs of the government receive a strict interpretation favorable to the public, and, in the absence of express provision or necessary implication, the sovereign remains unaffected.' "

*Withers*, 194 Or at 544.

rule founded in the principles of the common law, that the general words of a statute ought not to include the government, or affect its rights, unless that construction be clear and indisputable upon the text of the act.'

"In *Guaranty Trust Co. v. United States*, 304 US 126, 132, 82 L Ed 1224, 58 S Ct 785, Mr. Chief Justice (then Mr. Justice) Stone, after quoting from *United States v. Hoar*, said:

" '* * * Regardless of the form of government and independently of the royal prerogative once thought sufficient to justify it, the rule is supportable now because its benefit and advantage extends to every citizen, including the defendant, whose plea of laches or limitation it precludes; and its uniform survival in the United States has been generally accounted for and justified on grounds of policy rather than upon any inherited notions of the personal privilege of the king [citing cases]. So complete has been its acceptance that the implied immunity of the domestic 'sovereign,' state or national, has been universally deemed to be an exception to local statutes of limitations where the government, state or national, is not expressly included; and to the Conformity Act.'

"The rule that the statute of limitations does not apply to the state has been several times affirmed by this court. * * *"

*See also Day v. Salem*, 65 Or 114, 122, 131 P 1028 (1913) (discussing rationale for *nullum tempus* rule).

At common law, the *nullum tempus* rule protected the king's civil claims not only from the impediment of statutes of limitation but also from any claim of negligence or prejudicial untimeliness in pursuing claims:

*"Lapse of time does not bar the right of the crown.*

"In pursuance of the principle, already considered, of the sovereign's incapability of doing wrong, the law also determines that in the crown there can be no negligence or laches; and, therefore, it was formerly held, that no delay in resorting to his remedy would bar the king's right; for the time and attention of the sovereign must be supposed to be

occupied by the cares of government, nor is there any reason that he should suffer by the negligence of his officers, or by their fraudulent collusion with the adverse party * * *."

*A Selection of Legal Maxims* 65 (Herbert Broom ed., 8th American ed 1882) (emphasis in original). Following the broad formulation of the rule at common law, this court has applied the *nullum tempus* rule in other areas, such as to protect government from the defense of laches. *Corvallis Sand & Gravel v. Land Board*, 250 Or 319, 331-32, 439 P2d 575 (1968), states:

"By the great weight of authority in this country the defense of laches is not available against the government, state or national, in a suit by it to enforce a public right or protect a public interest * * *."

(Citations omitted.) *See also State ex rel Anderson v. Port of Tillamook*, 62 Or 332, 344, 124 P 637 (1912) (*nullum tempus* rule protects the right of private parties, acting on the relation of the state, to initiate *quo warranto* proceeding at any time; the lapse of time constitutes no bar to the proceeding).

Defendants argue that plaintiff is not entitled to rely on the two common-law rules discussed above for several reasons. First, defendants argue that those rules protect only the state government, not a quasi-municipal corporation such as plaintiff. Defendants rely for that view on a *dictum* statement by this court in *Withers*.[9] Defendants also rely on

---

[9] In *Withers*, two parties, one of whom was a successor-in-interest to the state, disputed water rights. The parties' rights turned on the question whether OCLA § 116-437, providing that water rights were forfeited if not used for five years, applied to the state. 194 Or at 542. The successor-in-interest to the state argued that OCLA § 116-437 did not so apply, invoking *nullum tempus. Id.* at 544. This court held that the state was not entitled to invoke *nullum tempus*, because OCLA § 116-437 was "passed for the public good." *Id.* at 556. In *dicta*, the court spoke to an argument against its holding:

"The argument that irrigation districts might lose their water rights for nonuser, if the statute in question should be held applicable to the state, is entirely beside the point. An irrigation district is a quasi-municipal corporation. *Central Pacific Co. v. Ager*, 144 Or 527, 533, 25 P2d 927. It is not the state, nor an agency of the state in the same sense as the State Land Board is an agency of the state. Were we called upon to determine whether irrigation districts are bound by the provisions of [OCLA § 116-437], we would not be in the least concerned with the maxim *nullum tempus*, which applies only to the sovereign, but with very different considerations, such, for example, as the purposes which irrigation districts are intended to serve under the statute which authorizes their creation."

*Id.*

*Cabell v. Fed. Land Bank of Spokane*, 173 Or 11, 144 P2d 297 (1943), but that case sheds no light on the issue.[10]

The parties appear to agree, as do I, that each of the common-law rules discussed above serve to protect identical levels of government. Neither common-law rule benefits a broader range of public entities than the other.

Several of this court's cases have identified the entity served by those two common-law rules as the "state." That is due, at least in part, to the state's participation in those cases as a party. *See, e.g., State Land Board v. Campbell*, 140 Or at 198 (applying rule against inclusion of government); *Corvallis Sand & Gravel*, 250 Or at 332 (applying *nullum tempus* rule, the defense of laches is not available against "the government, state or national * * *"). However, several of this court's decisions describe the public bodies to which those common-law rules apply in broader terms. *See Peninsula Dr. Dist. No. 2*, 212 Or at 418 (principle against inclusion of government applies to the "government, whether federal or state, [and] its agencies"); *State Land Board v. Lee*, 84 Or at 434 (*nullum tempus* rule protects "the government"); *Seton*, 34 Or at 273 (rule against inclusion of government applies to a county, which is an "agent or instrumentality of the state * * *"). *See also Day*, 65 Or at 122, in which this court, quoting other authorities, described the policy supporting the *nullum tempus* rule:

> " 'The real ground is a great principle of public policy, *which belongs alike to all governments*, that the public interest should not be prejudiced by the negligence of public officers, to whose care they are confided.' "

(Emphasis added.)

---

[10] In *Cabell*, an irrigation district sought foreclosure of a lien on a parcel of land. 173 Or at 16. The landowner argued that the district's claim was not timely filed under a six-year statute of limitations and the district demurred to the landowner's statute of limitation plea. *Id.* at 17. The trial court overruled the demurrer, but ruled ultimately that the district had no valid lien on the property. On appeal, this court stated that the trial court should have sustained the district's demurrer, because the applicable period of limitation for a suit upon a sealed instrument seeking no personal judgment was ten years, not six years. *Id.* at 19. However, this court decided that the trial court's disposition was correct under an alternative rationale, *viz.*, the land was not subject to any lien because it was not suitable for irrigation. *Id.* at 23. The opinion does not mention, let alone analyze, the relevance of the *nullum tempus* principle under those facts.

If any doubt lingers about the applicability of the two pertinent common-law rules to public entities other than the state, then *Chizek* resolves the doubt in Shasta View's favor. In *Chizek*, a county's grantees brought a suit to quiet title to a lot claimed by the defendant Port of Newport. 252 Or at 571. The port was a municipal corporation. ORS 777.005(5) (" 'Port' means a municipal corporation incorporated, or proposed to be incorporated, pursuant to ORS 777.010 and 777.050."). A previous owner of the lot, Sargeant, had failed to pay property taxes and transferred the lot to the port. *Id.* at 572. The county continued to assess property taxes against the property, although the port was exempt from taxation. Ultimately, the county foreclosed and sold the property to the plaintiffs. In the quiet title action, the port collaterally attacked the foreclosure proceeding. The plaintiffs contended that the collateral attack was barred by the statute of limitations, ORS 312.230,[11] and by laches. *Id.* at 574. The port answered that the statute of limitations did not apply to public bodies. *Id.* at 575.

This court, quoting *State Land Board v. Lee*, 84 Or at 434, first noted the

> " 'rule of universal recognition that the government is not included in a general statute of limitation unless it is expressly or by necessary implication included.' "

*Chizek*, 252 Or at 576. The court then stated the following holding:

> "We hold that the Port, *as a public body*, is not barred by the statute of limitations and the tax foreclosure proceeding is invalid and, therefore, the plaintiffs secured no title to the disputed property."

---

[11] ORS 312.230(1) and (3) state:

"(1) Every action, suit or proceeding, commenced for the purpose of determining the validity of a sale of real property on foreclosure for delinquent taxes, or to quiet title against such sale, or to remove the cloud thereof, or to recover possession of the property, shall be commenced within two years from the date of the judgment and decree of foreclosure and sale to the county, or within six months from June 1, 1961, whichever is the later.

"* * * * *

"(3) For all purposes this section shall be construed as a statute of prescription as well as a statute of limitation."

*Id.* at 578 (emphasis added).

Shasta View, like the Port of Newport in *Chizek,* is a public body, specifically, a quasi-municipal corporation created under the Irrigation District Law. ORS 545.001 *et seq. Central Pacific Co. v. Ager,* 144 Or 527, 533, 25 P2d 927 (1933) (an irrigation district, under Oregon's statute, is a quasi-municipal corporation); *Greig v. Owyhee Irr. Dist. et al.,* 102 Or 265, 273, 202 P 222 (1921) (same). As with other quasi-municipal corporations, irrigation districts are created by legislative enactment as "agenc[ies] of the state for a particular purpose * * *." *See Wasco County P.U.D. v. Kelly,* 171 Or 691, 719-20, 137 P2d 295 (1943) (citations omitted) (describing the attributes of a quasi-municipal corporation in those terms, and noting that irrigation, public utility, drainage, and school districts are in the same classification). *Chizek* indicates that Shasta View, as a public body, is entitled to rely on the rule of *nullum tempus.* Because the *nullum tempus* rule and the rule against inclusion of government apply to the same category of public bodies, Shasta View likewise is entitled to rely on the rule against inclusion of government.

The majority asserts that the *nullum tempus* rule is inapplicable here, because ORS 30.905(1) is a statute of ultimate repose, not a statute of limitation. According to the majority, a statute of repose provides a deadline for initiation of an action whether or not the plaintiff discovers the injury or whether the injury has even occurred, whereas a statute of limitation bars a litigant's right to a remedy.[12] *Shasta View,* 329 Or at 162-64.

---

[12] The label "statute of ultimate repose" can apply to any of several discrete legislative policy choices. Francis E. McGovern, *The Variety, Policy and Constitutionality of Product Liability Statutes of Repose,* 30 Am Univ L Rev 579, 582 (1981) (hereinafter *McGovern*):

"The term 'statute of repose' itself can create analytical difficulties unless there is an understanding of its meaning. Although courts may conclude that semantics is irrelevant to a consideration of statutes of repose, there are substantial reasons to use precise labels for underlying statutes. These reasons become particularly compelling when at least five definitions of 'statute of repose' are in use."

(Footnotes omitted.)

I assume, for purposes of argument, that the expiration of a statute of ultimate repose can effect harsher consequences on a plaintiff's claim than the expiration of a statute of limitations, as the majority theorizes.[13] But the majority's effort to point out the differences between those kinds of time deadlines with respect to the commencement of litigation logically should lead the majority to the conclusion that the *nullum tempus* rule applies here with even greater force.

By focusing exclusively on the distinctions between a statute of ultimate repose and a statute of limitation, the majority ignores the important feature that they share in this context: once the time deadline expires, each statute prevents the public body from asserting its civil claim on behalf of the public that it represents. The very purpose of the *nullum tempus* rule is to protect government from any prejudice to its claims due to the lapse of time unless the statute that created the time deadline applies to the government expressly or by necessary implication. That rule rests on a policy of protecting the public from the loss of its claims, due to the expiration of time, unless the lawmaking body acts explicitly to apply the time deadline to the claims of public bodies. If that public protection policy shields government from the assertion of any defense of untimeliness created by a statute of limitations, then by dint of reasoning, that policy applies all the more obviously to protect government from a time deadline that purports to nullify the government's civil claim. I see no sense in the majority's approach, which, in the context of statutory barriers to stale litigation, would protect the public from the lesser jeopardy of a timeliness defense,

---

[13] For criticism of the distinction between barring a "right" and a "remedy," see Note, *Developments in the Law—Statutes of Limitations*, 63 Harv L Rev 1177, 1186-88 (1950) ("Interpretation of the nature of limitations, proceeding blindly from an initial determination that they either bar the remedy only or extinguish the right entirely, has not proved satisfactory."); Calvin W. Corman, 1 *Limitation of Actions*, 7, § 1.1 (1991) ("Several recent decisions of the Alaska Supreme Court reveal the growing judicial belief that categorization of these statutes as conditioning the right, rather than providing remedy, actually sacrifices policy for the sake of formalistic legal abstraction."); Richard A. Epstein, *The Temporal Dimension in Tort Law*, 53 U Chi L Rev 1175, 1210 (1986) ("[I]t is wholly a matter of words to say that the cause of action was barred before it accrued or to say that it never existed at all. Whether [a statute of repose] should stand or fall should depend upon its substance, not upon an arbitrary judicial verbalization.").

but expose the public to the greater jeopardy of the nullification of its claims.[14]

The majority's error stems in part from its erroneous view that the *nullum tempus* rule applies solely to statutes of limitation. The early cases and treatise authors discussed the rule's operation in relation to statutes of "limitation" only because that was the label attributed at that time by the English parliament to statutes that established time deadlines for commencing particular civil actions. Note, *Developments in the Law — Statutes of Limitation,* 63 Harv L Rev 1177, 1178 (1950) ("The Limitation Act of 1623 marks the beginning of the modern law of limitations on personal actions in the common law.").[15]

---

[14] Widely divergent substantive consequences can flow from attaching the label "statute of ultimate repose" to a statute that incorporates a time deadline for the commencement of litigation. McGovern at 613. Therefore, courts must draw conclusions about a statute's meaning and effect only after analyzing conventional sources of legislative intent, especially the statute's text and context, and not simply affix a label and assume the statute's consequences from the label alone. For example, *Sealey v. Hicks,* 309 Or 387, 392, 788 P2d 435 (1990), asserted in *dictum* that ORS 30.905(1) was the "products liability statute of repose" without examining the statute's text and context to support that conclusion. Had the court conducted that analysis, it would have noticed that that statute is structurally identical to ORS 30.905(2), which the court correctly identified as a "statute of limitation," but with a deadline that commences to run on the date of purchase for use or consumption instead of the date of injury. The court rejected a potential construction that would make ORS 30.905(1) subordinate to ORS 30.905(2), but failed to consider whether subsections (1) and (2) simply express two parallel statutes of limitations, each of which could time bar a claim. Finally, the court failed to consider the significance of the absence of the phrase "in no event" from ORS 30.905(1), even though, in *Josephs v. Burns & Bear,* 260 Or 493, 501, 491 P2d 203 (1971), this court had held that that phrase helped establish that ORS 12.115(1) was a statute of ultimate repose for negligence.

[15] The early statutes of limitation shared more than a semantic similarity to modern statutes of repose, especially in their objective of bringing an end to potential litigation through the expiration of time. *See Ketchum v. State of Oregon,* 2 Or 103, 106 (1864):

> *"Statutes of limitations are intended to be statutes of repose, to prevent litigation; and where one has slept for years with a full knowledge of his rights, and seeks only to enforce them when essentially important witnesses have long since departed from the jurisdiction or reach of process, and the defendant is powerless from the frailties of human memory, it is eminently proper that the law should expressly intervene, and say to the plaintiff that his sleeping has been too long, and the advantage now sought too grossly faulty to be encouraged.* This view of the benefit of such a statute supposes that all this time the claimant was resting under the shadow of judicial tribunals whose assistance he might invoke; that by law he could at any time enforce his claim by action, and that he abused that right, and by delay disarmed his opponent of his watchfulness. Truly, the plaintiff has a right to choose the time to enforce his rights, but it is

The enactment of statutes of "repose" is a relatively recent legislative phenomenon. But the case law reviewed above indicates that statutes of limitation were designed to prevent litigation of stale claims, and that modern statutes of repose share the same objective. In light of that fact, it is unimaginable that an English common-law court would protect the sovereign's claims against the running of statutes of limitation, but permit statutes of repose, had they existed, to nullify the sovereign's claims without prescribing that consequence explicitly. Certainly those courts would have applied the *nullum tempus* rule to both kinds of statutes.

The majority also misperceives *how* the *nullum tempus* rule operates to protect government from the expiration of statutory deadlines. Under the common-law *nullum tempus* rule, statutory deadlines for the commencement of litigation, or for the timely assertion of civil claims or defenses, *do not commence to run against public bodies.* In other words, the rule dictates that, as to the claim of a governmental body, a statutory deadline *does not begin to run* and, therefore, never "expires." The majority's rationale, which imputes a more onerous consequence to the *expiration* of the time deadline in ORS 30.905(1) than to a statute of limitations, fails to recognize that the *nullum tempus* rule focuses on whether the statutory deadline *commences to run* on the government's claim, not on some particular effect of the deadline's *expiration*. The *nullum tempus* rule, correctly applied, compels the conclusion that Shasta View's claim never expired because, as to the claim of a public body, the eight-year period in ORS 30.905(1) never commenced to run. The majority's discussion of the consequences of expiration of a statutory deadline that never commenced to run is irrelevant.

---

a provident feature in the law to say that he must exercise that right within a reasonable time or the law will presume his claim satisfied."

(Citations omitted; emphasis added.) *See also Ford v. Schall*, 110 Or 21, 27-28, 221 P 1052, *on reh'g* 222 P 1094 (1924) (citation omitted) (" '[T]he statutes of limitations * * * are considered as statutes of repose, and as affording security against stale claims.' "); *Beekman v. Hamlin*, 19 Or 383, 387, 24 P 195 (1890) ("[T]he statute of limitations [is] one of the means of giving repose to stale subjects of litigation * * *."). The description of statutes of limitation as statutes of "repose" or "peace" is common in both this country and in England. *See also United States v. Kubrick*, 444 US 111, 117, 100 S Ct 352, 357, 62 L Ed 2d 259, 266 (1979) (statutes of limitation "are statutes of repose").

Without doubt, ORS 30.905(1) does not satisfy the *nullum tempus* rule that statutes must include public bodies expressly or by necessary implication in order for time to run against public bodies. ORS 30.905(1) does not make the period of repose applicable to the claims of public bodies expressly. ORS 30.905(1) begins with the following phrase: "Notwithstanding ORS 12.115 or 12.140 * * *."[16] ORS 12.115 is a statute of ultimate repose for negligence and ORS 12.140 is the general statute of limitations for any cause for which a period of limitations is not otherwise specified. The introductory phrase of ORS 30.905(1) signals only that the 8-year period for product liability claims operates notwithstanding the enactment of longer periods of repose or limitation for other types of claims in ORS 12.115 and ORS 12.140. The introductory phrase was intended only to eliminate the possible confusion that might result without an interpretive signal that explained the governing effect of ORS 30.905(1) in respect to product liability claims. That phrase in ORS 30.905(1) does not make the statute applicable to the claims of governmental bodies expressly or by necessary implication. Moreover, the legislature's enactment of a complete exemption for specified public bodies from an entire chapter of limitations, ORS 12.250, together with a related statute, ORS 12.135(1) and (5)(a),[17] that subjects public bodies to the

---

[16] ORS 12.115 states, in part:

"(1) In no event shall any action for negligent injury to person or property of another be commenced more than 10 years from the date of the act or omission complained of."

ORS 12.140 states:

"An action for any cause not otherwise provided for shall be commenced within 10 years."

[17] ORS 12.135 states, in part:

"(1) An action against a person, whether in contract, tort or otherwise, arising from such person having performed the construction, alteration or repair of any improvement to real property or the supervision or inspection thereof, or from such person having furnished the design, planning, surveying, architectural or engineering services for such improvement, shall be commenced within the applicable period of limitation otherwise established by law; but in any event such action shall be commenced within 10 years from substantial completion or abandonment of such construction, alteration or repair of the improvement to real property.

"* * * * *

"(5) This section:

"(a) Applies, in addition to other actions, to actions brought in the name of the state or any county or other public corporation therein, or for its benefit * * *."

statutory period of repose for claims arising from construction projects, demonstrates that the legislature's omission of a reference to the claims of public bodies in ORS 30.905(1) was intentional.

I agree with the view of *amicus* State of Oregon that nothing in ORS 30.905(1) compels the conclusion that that statute necessarily must apply to the claims of public bodies. Product liability claims arise no more frequently in regard to product purchases by public bodies than by private purchasers. If product vendors might suffer any genuine prejudice because public plaintiffs are exempt from ORS 30.905(1)—a fact about which the present record is noticeably silent—then we must conclude that the legislature anticipated and intended that consequence. Like *amicus* State of Oregon, I find nothing about the practical operation of ORS 30.905(1) that suggests that that statute necessarily must apply to claims by public bodies.

### 3. *Conclusion.*

The two common-law rules under consideration govern the construction of statutory text in context. Under the rule against inclusion of government, ORS 30.905(1) does not apply to product liability claims of a public body such as Shasta View, because the legislature did not make the statute apply to the claims of a public body expressly or by necessary implication. Under the *nullum tempus* rule, ORS 30.905(1) does not apply to Shasta View's product liability claim for the same reason.

I would answer Additional Question No. 3 "YES." Accordingly, I dissent from the majority's contrary answer.

In summary, I concur with the majority's answer to Certified Question No. 2. I would not answer Certified Question No. 1 because, in view of the answer to Certified Question No. 2, Certified Question No. 1 is moot. I dissent from the majority's answer to Additional Question No. 3.

Kulongoski, J., joins in this opinion.